[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 10, 2004
THOMAS K. KAHN
CLERK

No. 03-12230

D. C. Docket No. 00-02231-CV-ODE-1

CORNELIUS COOPER,
MICHAEL EDWARDS, et al.,

Plaintiffs-Appellants,

versus

SOUTHERN COMPANY,
GEORGIA POWER COMPANY, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(November 10, 2004)**

Before ANDERSON, CARNES and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

Cornelius Cooper and six other plaintiffs appeal from the district court's

orders denying class certification in their employment discrimination suit and

entering final summary judgment in favor of the defendants, the Southern

Company, Georgia Power Company, Southern Company Services, Inc., and Southern Company Energy Solutions, Inc. Seven current or former employees[1] of the various defendants brought this putative class action, alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, et seq., and 42 U.S.C. § 1981 ("Section 1981"). The plaintiffs claimed discrimination in promotions and compensation, and sought declaratory and injunctive relief, back pay, and compensatory and punitive damages. After denying class certification, the district court entered seven separate orders of summary judgment in favor of the defendants.

After painstaking review of the record, as well as careful consideration of the briefs and oral argument, we conclude that the district court did not abuse its discretion in denying class certification, because the plaintiffs demonstrated neither that they had satisfied the commonality and typicality requirements of Federal Rule of Civil Procedure 23(a), nor that damages were incidental to equitable and declaratory relief or that common questions of law or fact predominated, as required under Federal Rule of Civil Procedure 23(b)(2) or (b)(3). In addition, we are persuaded by none of the plaintiffs' arguments

---

[1]The plaintiffs/appellants are Cornelius Cooper, Michael Edwards, Charcella Green, Patricia Harris, Sarah Jean Harris, Irene McCullers, and Carolyn Wilson.

regarding the individual summary judgment orders and, accordingly, affirm in all respects the judgments of the district court.

I.

The complex facts and procedural history underlying this appeal are these. Seven African-American past or present employees of the defendant companies filed suit on July 27, 2000, alleging that the Southern Company and several of its subsidiaries -- Georgia Power Company, Southern Company Services, Inc. and Southern Company Energy Solutions, Inc. -- unlawfully discriminated against their employees on account of race.[2] The plaintiffs alleged that the defendants discriminated against them in connection with promotion opportunities and performance evaluations, as well as in terms of compensation, and claimed that the defendants tolerated a racially hostile working environment. Notably, the plaintiffs sought to represent a Rule 23 class that they described in the following terms:

> All African-American persons employed by Southern Company's Corporate Office, Georgia Power Company, Southern Company Services, Inc. or Southern Company Energy Solutions, Inc., in the United States at any time from July, 1998 to the present, who are

[2]The plaintiffs subsequently amended their Complaint in August, 2000. After the defendants answered the Amended Complaint, and the district court granted permission to amend and supplement the Amended Complaint, the plaintiffs filed a Third Amended Complaint on December 11, 2000. Unless otherwise noted, throughout this opinion references to the "Complaint" are to the plaintiffs' Third Amended Complaint.

subject to the Defendants' employment, personnel and human resources policies and practices and who have been, continue to be, or may in the future be adversely affected by the Defendants' racially discriminatory employment policies and practices ("the Class").

Cooper v. Southern Co., 205 F.R.D. 596, 598-99 (N.D. Ga. 2001). At the time suit was filed, the proposed class included approximately 2,400 individuals residing in Georgia, Alabama, Florida, and Mississippi, and working at locations dispersed throughout the four states. The proposed class consisted of entry-level manual laborers and skilled professionals, among others, and encompassed exempt, non-exempt,[3] unionized and non-unionized workers.

In essence, the plaintiffs maintain that the various defendant companies share a common system for personnel decision-making, which constitutes a "common policy or practice" that is appropriately challenged on a class-wide basis. Specifically, plaintiffs say that there are "common promotion and compensation policies and practices, which give managers unfettered discretion to make subjective, non-job-related decisions." Appellants' Brief at 2. According to plaintiffs, these "common policies and practices . . . foster a pattern or practice of

---

[3]Non-exempt employees are covered by the requirements of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., including, for example, its overtime provisions. Exempt employees are not covered by the FLSA.

race discrimination or have a disparate impact on black employees," id., and plaintiffs sought to redress the claimed wrongdoing in the form of a class action.

A.

The defendants include four companies that provide a wide range of energy-related products and services throughout the southeastern United States. The Southern Company ("TSC") is a holding company that itself has no employees, but which owns stock in the other defendant companies, all Southern Company subsidiaries. TSC is a Delaware corporation that is domesticated under the laws of Georgia and maintains its corporate headquarters in Atlanta, Georgia. In addition, TSC is the corporate parent of various other utility companies not directly involved in the lawsuit.

Georgia Power Company ("GPC") is the Southern Company's largest subsidiary, and provides electricity to approximately 1.9 million customers in 153 of Georgia's 159 counties. GPC employs approximately 9,000 employees in the state of Georgia, some 44% of whom are covered by a collective bargaining agreement ("CBA") with the International Brotherhood of Electrical Workers ("IBEW"), Local No. 84. GPC's operations are extremely diversified, and its facilities, workforce, and management are dispersed across the entire state of Georgia. Certain functions within GPC are divided among different regions in the

state, and widely divergent operating and management structures exist within different regions. Thus, for example, GPC's Customer Operations function across 16 regions that have very different workforces. The expansive and rural Southeast Region has very different characteristics with respect to technology, customer service, and distribution capacity than does the metropolitan Atlanta region, a dense and highly-populated area that includes numerous commercial clients.

Southern Company Energy Solutions ("SCES"), in turn, is a non-regulated, non-utility subsidiary of the Southern Company that develops for sale various energy-related products and services. SCES consults with commercial and industrial clients on energy efficiency, provides energy efficiency and environmental programs and services, and offers other services to commercial and residential customers. Most of the fewer than 300 employees employed by SCES are exempt employees whose compensation is determined by sales commissions; none of SCES's employees is a member of a union.

Finally, Southern Company Services ("SCS") provides the other defendants with human resources services and administers common compensation and promotion policies. SCS also provides various public relations and employee relations services to the other defendant companies. SCS employs approximately 3,500 non-unionized employees who work primarily in Georgia and Alabama,

although they also coordinate services in Mississippi, Florida, New York, and Washington, D.C.

The differences in management structures, working environments, and criteria for employment decisions vary substantially among the defendant companies. The  promotion and compensation decisions affecting laborers involved in electrical power transmission and distribution, for example, take into account very different criteria than do decisions involving the professional and managerial ranks of the companies. Similarly, the more than 200 locations in which employees of the different defendants work are spread throughout a widely dispersed geographical area and encompass an extremely diverse range of working environments.

While the operations and workforces of the defendant companies are substantially different, they are linked in several ways. All the defendants maintain a common job, salary, and pay-grade system that dictates salary ranges for both exempt and non-exempt employees. Non-exempt employees are classified from grade NE1 through NE9; exempt employees are classified at grades E1 through E15. Salary ranges for each grade vary significantly.[4] While

_____

[4]In 1998, for example, grade E5 ranged from $42,396 to $67,837, and grade E3 ranged from $34,020 to $54,432. Thus, an employee with a salary at the upper range of one grade might receive a higher salary than an employee with a salary in the lower range of the next higher

7

the same pay-grade system is used within all of TSC's subsidiaries, the workforces within the different companies are strikingly different. Not every position exists in every company, and in some subsidiaries the job responsibilities for a given position differ greatly from the responsibilities for the same position in another subsidiary. Job positions may also correspond to different pay-grade ranges within different subsidiaries.

The terms of compensation for unionized workers are strictly governed by the terms of the CBA, giving managers precious little discretion over salary and similar issues. For non-unionized workers, hiring and promotion decisions are made by managers of various rank based in geographically dispersed facilities within each of the defendant companies. Different managers assign various weights to different qualifications in making their employment decisions, and managers have the discretion to utilize a wide range of processes and procedures when making compensation and promotion decisions.

Several different types of promotions are available to non-unionized employees. Most competitive job openings -- jobs open to any qualified employee -- are posted on a computer intranet system known as "JobNet," which is

---

grade. This could result in a white employee in a lower salary grade receiving a higher salary than a black employee in a higher salary grade. The plaintiffs say that the defendants exploited this possibility to mask racial discrimination.

8

accessible to employees within each TSC subsidiary.  SCS recommends

standardized processes for filling JobNet positions, but managers within the

various subsidiaries retain discretion in choosing whether to post job vacancies.

Other promotions occur outside the context of the competitive promotions

available on JobNet.  For example, employees can advance within their own "job

family."  These "progressive promotions" occur when employees meet pre-

determined performance goals or demonstrate satisfactory work over a given

period.  Under these circumstances, an employee may be promoted, for example,

from an Operator II position to an Operator I position.  These promotions are not

competitive since they do not involve unfilled positions, but rather are available

only to employees progressing individually within their own job family.

SCS also provides numerous programs and procedures designed to assist

managers within the other defendant companies in evaluating employees and

making compensation and promotion decisions.  These procedures are designed to

ensure that employees are evaluated, compensated, and promoted based on job-

related factors, in accordance with the companies' strict prohibitions on

discrimination on account of race.  Thus, for instance, SCS provides the defendant

companies with resources to assist managers in promotion decisions, including

structured interview guidelines designed to evaluate job-related skills.  SCS also

recommends that employees receive regular written and oral evaluations, and develops specific evaluation forms for this purpose.

SCS and the other defendants have all developed affirmative action plans to address workforce diversity, and they also provide professional development and professional mentoring programs to facilitate employees' professional growth. SCS's Equal Employment Opportunity ("EEO") Department has primary responsibility for ensuring compliance with anti-discrimination and equal opportunity laws. The EEO Department's policy is to investigate discrimination complaints, and if any discrimination or harassment is revealed, to take remedial action to eliminate the discrimination or harassment. SCS's EEO Department also acts in conjunction with Compliance Officers within each defendant company to conduct annual compliance surveys. Every individual employee within the defendant companies receives an annual compliance questionnaire, which asks whether the employee is aware of any incidents of discrimination or harassment.

The EEO Department also conducts quarterly Equal Employment Opportunity reviews designed to ensure that all the defendant companies comply not only with the applicable anti-discrimination laws, but also with their own internal policies. In these reviews, the EEO Department evaluates the hiring, promotion, and compensation practices of randomly selected departments within

the various defendant companies, with the goal of remedying any inconsistencies that may exist between a department's practice and the defendant's EEO policies.

The defendant companies have also implemented various training programs to promote compliance with all EEO policies and anti-discrimination laws. Many of the defendants' managers are required to attend "FEDLAW," a one-day seminar that provides an overview of the federal anti-discrimination laws applicable to the defendants' workplaces. The defendants also encourage their employees and managers to attend another one-day training session, the "Civil Treatment" seminar. In the "Civil Treatment" training, employees are reminded of the defendants' anti-discrimination policies and encouraged to report any violations.

Finally, all employees of SCS and SCES are entitled to raise EEO concerns with SCS's Employee Concerns department, and unionized employees at GPC may raise discrimination complaints with their union stewards, pursuant to successive agreements between GPC and Local 84 of the IBEW. GPC employees may also bring complaints to the Corporate Concerns Department or the Corporate Security Department.

B.

The seven named plaintiffs are African Americans who work (or formerly worked) in a wide assortment of union and non-union positions within GPC, SCS

11

and SCES, and who have been subjected to compensation and promotion decisions made by different managers utilizing different procedures. We analyze in detail the individual claims of each plaintiff in Section III, infra, which addresses each of the summary judgment orders, but offer here a brief summary of each plaintiff's work history in order to measure his or her claims against the standards embodied in Rule 23 of the Federal Rules of Civil Procedure.

Cornelius Cooper ("Cooper") works as a Lineman for GPC in Atlanta, Georgia, where he has been employed since 1973. At the time the suit was filed, Cooper had been employed by GPC for some 28 years. He has been a union member during his employment at GPC, and thus, his compensation and promotions within the bargaining unit have been governed by the terms of the CBA. Cooper received his current Lineman position in 1981 and has not been promoted since, in spite of positive work evaluations; he claims that less qualified white employees have been promoted while he could not advance for nearly 20 years.

Cooper has not taken the First Line Supervisor test, nor has he applied for a Foreman position since at least 1990, because no Foreman positions have been open in that time. He has not applied to be a crew leader. However, Cooper maintains that he suffered discrimination when he was denied two promotions in

12

1998. The first position that Cooper was denied was as a Lighting Coordinator, an opening that was posted on JobNet in July 1998. Later that year, Cooper applied for and was denied a non-union Methods & Training Specialist ("Trainer") position at the Klondike Training Center. Of several Trainer jobs open at the time, at least one was awarded to an African-American employee, Charlie Johnson.

Michael Edwards ("Edwards") had worked at GPC for 13 years when this suit was commenced. Like Cooper, Edwards has held a variety of union positions in which his compensation and promotions were subject to the terms of the CBA. Over the course of his employment with GPC, Edwards worked in several different departments of the company, based in different cities throughout Georgia. He maintains that he has been denied various promotions to union positions, especially in the two years immediately before the suit was filed, and was frequently denied even an opportunity to interview for these positions.

In April 2000, Edwards did interview for a Cable Locator position, but was denied the job. Edwards says that he was fully qualified for the position, having worked for 5 months as a Cable Locator in a temporary capacity, and having worked as a Lineman, which involved more extensive and difficult responsibilities than a Cable Locator. In spite of his qualifications, Edwards did not receive the job, which was instead given to a white co-worker whom Edwards argues was less

13

qualified. Edwards was denied the Cable Locator position after his interviewers found his demeanor "too relaxed."

During his tenure at GPC, Edwards suffered injuries to his back, and as a result he has had several extended absences and light duty assignments. Between May and November, 1998, Edwards took a medical leave from GPC, returning to take a temporary position which he held until its elimination in April 2000. Since that time he has been out of work on disability leave.

Edwards filed a complaint with the EEOC in 1999, alleging a violation of the Americans with Disabilities Act ("ADA"), but he did not allege any race-based discrimination at that time. Less than a week prior to the filing of this suit, however, he lodged a complaint with the EEOC that alleged individual and class-wide racial discrimination. On appeal, Edwards raises three other promotion claims that were not included in the Complaint.

Charcella Green ("Green") had been employed at GPC for 17 years when this suit was filed. For the last 11 of those years she worked as an Education Services Coordinator, after having been employed in various capacities since initially joining GPC as a temporary intern in 1983. While Green advanced through various positions at GPC, she acquired several educational credentials. Prior to joining GPC, Green received a B.S. degree in Human Services

14

Administration from Mercer University, and in 1983 she was awarded a Master of Social Work degree. While working at GPC, she continued her education, eventually receiving a Ph.D. from Clark Atlanta University.

From 1996 until her department was eliminated in 2002, Green worked at GPC's headquarters in Atlanta in a range of exempt positions in the Educational Services department. She complains that she was wrongfully denied an Educational Services Manager position in 1996 and a Community Advisor position in 1997. On July 11, 1998, Green was again denied a Manager of Educational Services position that was awarded to a white employee. Green also says that she has been compensated at a less favorable rate than white employees.

Patricia Harris ("P. Harris") voluntarily resigned from SCS in August 1999, prior to the commencement of this case. P. Harris began working at GPC in 1990, and became an employee of SCS in 1997, when she began working as a Market Research Analyst in Atlanta. P. Harris did not apply for any promotions during the relevant period and did not file any complaints with the EEOC. However, she maintains that she was only granted her Market Research Analyst position after repeatedly complaining -- including to a GPC Vice President -- about the difficulty of advancing. P. Harris contends that her white counterparts were promoted much

more easily, and says that once she began working as a Market Research Analyst, she was provided with less training and support than her white colleagues.

P. Harris also claims that she suffered discrimination in compensation on account of race, observing that she was paid at the low end of her salary grade, while white colleagues were more generously compensated, notwithstanding their being less qualified. Indeed, P. Harris points out that she earned a Master of Business Adminstration degree, while her white co-workers lacked that credential.

Sarah Jean Harris ("S.J. Harris") was employed by GPC from 1979 until 2000, working in various non-exempt, non-union customer services positions in Lawrenceville, Duluth, and Gwinnet, Georgia. Hired in 1979 as a General Clerk, she had been promoted to Operating Assistant by 1989. In 1994, S.J. Harris was assigned to work in Duluth as a Secretary; her job title was changed to Region Support Representative in 1997. Working as a Region Support Representative, S.J. Harris was the only African-American employee in an 18-person department. She alleges that she was discriminated against in her employee evaluations, claiming that she received lower evaluation scores than she deserved, while white employees received inappropriately positive evaluations. She also observes that she received only "minuscule" salary increases during her tenure, and has therefore received lower compensation than white employees.

16

S.J. Harris did not apply for any promotions during the relevant period and has brought no promotion claims. However, in addition to raising her compensation discrimination claims, S.J. Harris contends that she was wrongfully fired in retaliation for her involvement in this lawsuit. GPC denies any retaliatory motive and contends that she was fired for disciplinary reasons, after having received several negative evaluations and having been placed in a disciplinary program. While on "last-chance" probation, S.J. Harris was again disciplined, and then was terminated.

Irene McCullers ("McCullers") was hired by GPC in 1978, and worked in several clerical positions until 1997, when she was transferred to SCS. Since 1997, McCullers has worked at SCS as a non-exempt Processing Operator I in the Information Management Services Department. Altogether, McCullers had spent 23 years working for the defendant companies at the time suit was filed. McCullers alleges that she was discriminated against in terms of her compensation, promotions, and performance evaluations.

Specifically, McCullers contends that within her department there are six employees working as Processing Operators: two African-American and two white employees hold Processing Operator I titles, and two white employees hold Processing Operator Senior positions. McCullers alleges that she and her African-

17

American colleague are victims of racial discrimination in that they are the lowest paid employees. McCullers adds that she is paid approximately 10% less than her white colleagues, even though she has an associates degree in business administration, while the white employees have no more than a high school education.

McCullers also maintains that she has been discriminated against in promotions. She avers that at the time her department was reorganized in 1997, she was discriminatorily denied a progressive promotion from Processing Operator I to Processing Operator Senior, while at least one white counterpart was promoted to the senior position. In the two years before this litigation commenced, McCullers was again denied a promotion to Processing Operator Senior, while another white colleague was promoted.

Finally, Carolyn Wilson ("Wilson"), the seventh of the named plaintiffs, began working for the defendants in 1985, when she was hired by GPC as an employee in its Customer Service Operations. In 1997, she was hired as a Project Analyst in the Finance Center at SCES. Wilson maintains that she experienced racial discrimination in promotion and compensation decisions, as well as with respect to her performance evaluations. Wilson says that she uniformly performed her job well and received positive performance evaluations, and yet was denied

18

numerous promotions for which she was qualified. She adds that while she applied for approximately 15 promotions within the defendant companies, she was granted only 3 interviews, and was denied several promotions because of her race. In November 1997, Wilson applied for and was granted a Project Analyst Senior position at SCES, which she learned of through the JobNet system, but her position was re-classified as a Project Analyst III, a lower- level position than she had sought. The following year, Wilson applied for and was offered a Customer Service Representative position, but turned it down.

At approximately the same time this lawsuit was commenced, Wilson filed a charge with the EEOC, but she did not identify the specific event or events that constituted the discrimination she faced, instead alleging discrimination more generally. She maintains that she is compensated less favorably than at least four white colleagues who perform the same job as she does, even though they are classified at the same, or lower, salary grades.

To summarize, of the seven named plaintiffs, three no longer worked for any of the defendants at the time this case was commenced (Edwards, P. Harris, and S.J. Harris). Of the four remaining employees, one held a position which was covered by the CBA (Cooper), two held exempt positions outside senior

management (Green and Wilson), and one held a non-exempt position (McCullers).

Although at various times during their employment with the defendants, some of the plaintiffs worked in Georgia locations outside metropolitan Atlanta, most of them were employed in Atlanta for most or all of their tenures. Several of the named plaintiffs worked in office environments characteristic of the central administrative operations that took place in Atlanta, and even Edwards and Cooper -- who labored in connection with the direct delivery of electricity -- worked in more developed urban areas of Georgia. None of the named plaintiffs worked in the less densely populated, rural areas of the state, and although the plaintiffs sought to represent a broad class including employees based throughout Florida, Mississippi, and Alabama, none of them worked within these states.

All of the plaintiffs complained of discrimination in either compensation or promotion, and while none of the plaintiffs produced direct evidence that the personnel decisions in their individual cases were motivated by race, each plaintiff alleged that he or she was victimized by a common policy of subjective decision-making that allowed discrimination to persist in the defendant companies. Specifically, the plaintiffs' Complaint asserted that there was a class-wide "continuing pattern and practice of racial discrimination," that they and the

putative class members were subjected to discriminatory treatment, and that the defendants' policies and practices "had an ongoing disparate impact."

Two major issues are presented in this appeal. First, plaintiffs argue that the district court abused its discretion when it denied their motion for class certification under Rule 23 of the Federal Rules of Civil Procedure. Second, they say that the district court erred when it granted summary judgment in favor of the defendants on each of the seven named plaintiffs' individual claims. We address each of these issues in turn.

## II.

We begin with the plaintiffs' basic argument that the district court abused its discretion when it denied their motion for class certification.[5] In denying the

[5]As a preliminary matter, the defendants suggest that if we affirm the district court's summary judgment orders as to each of the named plaintiffs, the class certification issue is moot. This position has intuitive appeal, since it might seem improbable that plaintiffs whose own claims cannot survive summary judgment could represent a larger class of plaintiffs. That is, if we affirm the final orders of summary judgment on the named plaintiffs' claims, it would appear unnecessary to reach the class certification issue, because even if other class members retained valid claims, they would have no representative plaintiffs to prosecute their claims. See Satterwhite v. City of Greenville, 634 F.2d 231, 234 (5th Cir. 1981) (en banc) (Gee, C.J., dissenting) (arguing that requiring an appellate court to revisit the class certification issue even if the named plaintiffs' claims fail could lead to the "extreme" result "that a class need have no personal representative at all: only a putative cause and a counsel").

The plaintiffs, on the other hand, have directed our attention to Martinez-Mendoza v. Champion International Corp., 340 F.3d 1200 (11th Cir. 2003), in which a panel of this Court held that "even after finding against plaintiffs on the merits, the [district] court should have determined whether the class action could be maintained, and whether the plaintiffs could represent that class." Id. at 1215. Martinez-Mendoza reflects established Circuit precedent that

21

plaintiffs' motion, the district court first considered the plaintiffs' anecdotal and

statistical evidence, before concluding that the plaintiffs could not satisfy the basic

requirements of Rule 23(a) of the Federal Rules of Civil Procedure.[6]

_____

requires us to revisit the class certification issue even if we affirm summary judgment for the
defendants.

      In White v. I.T.T., 718 F.2d 994 (11th Cir. 1983), a panel of this Court explained that
where

> a plaintiff brings both an individual and class action; the class action is dismissed
> pretrial; he loses his individual claim at trial and then appeals the dismissal of his
> class action . . . we have remanded the case to the district court to determine (1)
> the presence of a live controversy involving the proposed class, and if one is
> present, (2) whether, pursuant to Rule 23, the action is appropriate for class
> certification and the appellant is a proper representative of the proposed class (or
> if not, whether there exists an appropriate class representative who can be
> substituted for the appellant).

Id. at 997-98. It is "[t]he law of this circuit . . . [that] a plaintiff's capacity to act as representative
of the class is not ipso facto terminated when he loses his case on the merits." Martinez-
Mendoza, 340 F.3d at 1215; see also Satterwhite, 634 F.2d at 231-32; Armour v. City of
Anniston, 654 F.2d 382, 383 (5th Cir. Unit B Aug.1981) (per curiam). (In Bonner v. City of
Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this Court adopted as binding
precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.).

      Under the law of this Circuit, a live controversy involving a putative class may continue
even when the claim of a specific plaintiff fails. Thus, even if we affirm each summary judgment
order entered against the individual plaintiffs, the class certification issue may not be moot, and
we are still required to address the district court's denial of class certification.

      [6] Rule 23(a) provides that:

> One or more members of a class may sue or be sued as
> representative parties on behalf of all only if (1) the class is so
> numerous that joinder of all members is impracticable, (2) there are
> questions of law or fact common to the class, (3) the claims or
> defenses of the representative parties are typical of the claims or
> defenses of the class, and (4) the representative parties will fairly
> and adequately protect the interests of the class.

Alternatively, the district court held that individual questions of law and fact plainly outweighed any common questions, and therefore that this suit was not appropriate for certification under either subsection (2) or (3) of Rule 23(b) of the Federal Rules of Civil Procedure.[7] The plaintiffs maintain that the district court's denial of class certification results from "fundamental errors of law and a

Fed R. Civ. P. 23(a). We refer to these four requirements as the numerosity, commonality, typicality, and adequacy criteria. See Prado-Steiman v. Bush, 221 F.3d 1266, 1278 (11th Cir. 2000).

[7]Rule 23(b) provides, in pertinent part, that:

> [a]n action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
> . . . .
>
> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
>
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed R. Civ. P. 23(b).

fundamental misconception of the role of the court in ruling on a motion for class certification." Appellants' Brief at 8. We remain unpersuaded.

A.

Questions concerning class certification are left to the sound discretion of the district court. Armstrong v. Martin Marietta Corp., 138 F.3d 1374, 1386 (11th Cir. 1998) (en banc); Freeman v. Motor Convoy, Inc., 700 F.2d 1339, 1347 (11th Cir. 1983). "A district court's decision whether or not to certify a class under Rule 23 of the FRCP is reviewed for abuse of discretion. As long as the district court's reasoning stays within the parameters of Rule 23's requirements for the certification of a class, the district court decision will not be disturbed." Hines v. Widnall, 334 F.3d 1253, 1255 (11th Cir. 2003) (citations omitted).

Even if we would have certified a class, that does not mean the district court abused its discretion in declining to do so. Id.; see also Shroder v. Suburban Coastal Corp., 729 F.2d 1371, 1374 (11th Cir. 1984). Indeed, the distinguishing hallmark of abuse-of-discretion review is that it "presupposes a zone of choice within which the trial courts may go either way." Kern v. TXO Prod. Corp., 738 F.2d 968, 971 (8th Cir. 1984).

> By definition . . . under the abuse of discretion standard of review there will be occasions in which we affirm the district court even though we would have gone the other way had it been our call. That

24

is how an abuse of discretion standard differs from a <u>de novo</u> standard of review. As we have stated previously, the abuse of discretion standard allows "a range of choice for the district court, so long as that choice does not constitute a clear error of judgment."

<u>Rasbury v. I.R.S.</u>, 24 F.3d 159, 168 (11th Cir. 1994) (quoting <u>United States v. Kelly</u>, 888 F.2d 732, 745 (11th Cir. 1989) (citation omitted)).

First, the plaintiffs argue that the district court erred by "reaching the merits" of the plaintiffs' claim at the preliminary stage of class certification. Thus, we are required to determine whether the trial court properly assessed the plaintiffs' evidence only to the extent necessary to decide the issue of class certification, or whether the trial judge impermissibly usurped the role of the jury by ruling on the merits of the plaintiffs' statistical and expert evidence. After thorough review of this record, we are satisfied that the district court did not improperly invade the jury's province when it conducted (as it was required to do in this case) a rigorous analysis of the evidence proffered by the parties at the class certification stage.

The plaintiffs rely on the Supreme Court's often-cited admonition in <u>Eisen v. Carlisle & Jacqueline</u>, 417 U.S. 156, 94 S. Ct. 2140, 40 L. Ed. 2d 732 (1974), that "nothing in either the language or history of Rule 23 . . . gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to

determine whether it may be maintained as a class action." Id. at 177, 94 S. Ct. at 2152. However, we have noted that "[w]hile it is true that a trial court may not properly reach the merits of a claim when determining whether class certification is warranted, this principle should not be talismanically invoked to artificially limit a trial court's examination of the factors necessary to a reasoned determination of whether a plaintiff has met her burden of establishing each of the Rule 23 class action requirements." Love v. Turlington, 733 F.2d 1562, 1564 (11th Cir. 1984) (citation omitted).

Indeed, both the Supreme Court and this Court have noted since Eisen that evidence pertaining to the requirements embodied in Rule 23 is often intertwined with the merits, making it impossible to meaningfully address the Rule 23 criteria without at least touching on the "merits" of the litigation. See Coopers & Lybrand v. Livesay, 437 U.S. 463, 469 n.12, 98 S. Ct. 2454, 2458 n.12, 57 L. Ed. 2d 351 (1978) ("Evaluation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims." (citation omitted)); Nelson v. U.S. Steel Corp., 709 F.2d 675, 679 (11th Cir. 1983) (explaining that Rule 23(a) evidence "is often intertwined with the merits").

As the Supreme Court has noted, the bare allegation that racial discrimination has occurred "neither determines whether a class action may be

26

maintained . . . nor defines the class that may be certified." <u>Gen. Tel. Co. of the Southwest v. Falcon</u>, 457 U.S. 147, 157, 102 S. Ct. 2364, 2370, 72 L. Ed. 2d 740 (1982).  Rather, before a district court determines the efficacy of class certification, it may be required to make an informed assessment of the parties' evidence.  That a trial court does so does  not mean that it has erroneously "reached the merits" of the litigation.  <u>See</u> <u>Kirkpatrick v. J.C. Bradford & Co.</u>, 827 F.2d 718, 722 (11th Cir. 1987).

In this case, the district court was obliged to make some preliminary assessment of the plaintiffs' evidence to determine, at the very least, whether the named plaintiffs were claiming discrimination that was <u>common</u> to the members of the putative class.  Indeed, the district court would have erred if it had certified a class without first determining that the named plaintiffs had claims common to those of the unnamed class members.

B.

We turn, then, to whether the court's substantive determinations at the class certification stage amounted to an abuse of discretion.  The plaintiffs say that the district court erred by concluding that they had failed to establish the

27

commonality, typicality, and adequacy[8] requirements of Rule 23(a). They claim that there were questions of law and fact common to the entire class and that the claims of the named plaintiffs were in fact typical of all the class members.

The four basic requirements of Rule 23(a) are "designed to effectively limit class claims to those 'fairly encompassed' by the named plaintiffs' individual claims." Prado-Steiman, 221 F.3d at 1278 (quoting Falcon, 457 U.S. at 156, 102 S. Ct. at 2370) (internal quotation marks omitted). As the district court put it, Rule 23(a) is designed to ensure that "the common bond between the class representatives' claims and those of the class is strong enough so that it is fair for the fortunes of the class members to rise or fall with the fortunes of the class representatives." Cooper, 205 F.R.D. at 608-09.

The typicality and commonality requirements are distinct but interrelated, as the Supreme Court has made clear:

> The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so

---

[8]The district court concluded that because they failed the commonality and typicality requirements under Rule 23(a), the named plaintiffs could not adequately represent the other putative class members. See Cooper, 205 F.R.D. at 627. The district court did, however, determine that the plaintiffs' counsel were "capable and experienced lawyers who would more than adequately represent the class, were a class certified." Id. The defendants do not challenge this conclusion concerning the adequacy of plaintiffs' representation.

28

interrelated that the interests of the class members will be fairly and adequately protected in their absence.

Falcon, 457 U.S. at 157 n.13, 102 S. Ct. at 2370 n.13. We have similarly explained that "the commonality and typicality requirements of Rule 23(a) overlap. Both requirements focus on whether a sufficient nexus exists between the legal claims of the named class representatives and those of individual class members to warrant class certification." Prado-Steiman, 221 F.3d at 1278.

"A class representative must possess the same interest and suffer the same injury as the class members in order to be typical under Rule 23(a)(3)." Murray v. Auslander, 244 F.3d 807, 811 (11th Cir. 2001). "[T]ypicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large." Prado-Steiman, 221 F.3d at 1279.

While not entirely dissimilar to the typicality requirement, Rule 23(a)'s commonality requirement measures the extent to which all members of a putative class have similar claims. "Traditionally, commonality refers to the group characteristics of the class as a whole [while] typicality refers to the individual characteristics of the named plaintiff in relation to the class." Id. Under the commonality requirement, "a class action must involve issues that are susceptible to class-wide proof." Murray, 244 F.3d at 811.

Neither the typicality nor the commonality requirement "mandates that all putative class members share identical claims, and . . . factual differences among the claims of the putative class members do not defeat certification." Baby Neal v. Casey, 43 F.3d 48, 56 (3d Cir. 1994) (citation omitted); see also Prado-Steiman, 221 F.3d at 1279 n.14; Appleyard v. Wallace, 754 F.2d 955, 958 (11th Cir. 1985). Nevertheless, the named plaintiffs' claims must still share "the same essential characteristics as the claims of the class at large." Appleyard, 754 F.2d at 958 (citation and internal quotation marks omitted).

As for the typicality requirement, the district court concluded that while some of the named plaintiffs had claims that could be typical of subgroups within the larger class, collectively the named plaintiffs did not have claims typical of the entire class. Thus, for example, plaintiff Edwards's claims were uniquely tied to issues relating to his disability; plaintiff S.J. Harris's claims could not be divorced from the disciplinary issues relating to her case; and although Cooper's claims were typical of union members denied promotion to non-union jobs, they were not typical of those union members who might have complaints relating to the denial of union positions.

Similarly, none of the named plaintiffs had claims typical of members of the putative class who were denied senior management positions, nor did any of the

30

named plaintiffs have compensation claims typical of upper-management employees. And while the plaintiffs' claims may have been typical of some subclasses of the defendants' workforce, it is not certain that their claims would be typical of other subclasses. Thus, for example, the specific job-related criteria GPC uses to make employment decisions affecting its rural power-delivery operations may be very different from the criteria underlying decisions about employees in their administrative offices. As a result, the named plaintiffs did not present claims typical of the <u>full range</u> of employees in their putative class.

The plaintiffs argue, nevertheless, that the district court erred by focusing on the idiosyncratic features of the different named plaintiffs' claims instead of acknowledging that the claims of the plaintiffs and the members of the larger class were based on the same legal theories. That is, the plaintiffs say that their individual injuries "arise out of the same pattern and practice [of discrimination] and same [discriminatory] policies that give rise to the injuries of the class members." Appellants' Brief at 18.

We reiterate that our review is only for abuse of discretion, and that whether we would have certified the class in the first instance -- or even some grouping of subclasses -- is not dispositive. <u>Hines</u>, 334 F.3d at 1257; <u>see also</u> <u>Shroder</u>, 729 F.2d at 1374. Here, the district court's analysis as to typicality fell within the

31

range of choice permissible on abuse-of-discretion review and did not represent a clear error in judgment. See Kelly, 888 F.2d at 745.

First, the compensation and promotion decisions affecting each of the named plaintiffs were made by individual managers in disparate locations, based on the individual plaintiffs' characteristics, including their educational backgrounds, experiences, work achievements, and performance in interviews, among other factors. In Love v. Turlington, we held that the district court had not abused its discretion in denying class certification based on the plaintiffs' failure to meet the typicality and commonality requirements. 733 F.2d at 1564. That case involved a challenge to Florida's SSAT-I, a test designed to identify high school students who had failed to master one of the state's academic performance standards. Students failing the test were identified for remedial assistance, but a failure did not automatically render a student ineligible for a high school diploma. Rather, decisions on each individual student's eligibility for a diploma were "made by individual teachers on the basis of [the student's] individual achievements. Each student's situation differs, and the diploma is denied each student for reasons which are unique to his situation, and which do not necessarily correspond to his performance on the SSAT-I." Id. Similarly, in the instant case the compensation

32

and promotion decisions affecting each of the named plaintiffs were based on factors that, by and large, appear unique to each of the plaintiffs in question.

In addition, the plaintiffs sought to represent a very broad class that purported to represent <u>all</u> African-American employees of the defendants, at <u>all</u> levels of the corporate hierarchy of <u>all</u> the defendant companies. Because the plaintiffs asserted broad claims on behalf of a broad class, they were required to identify representative plaintiffs who shared those broad claims. However, while the different named plaintiffs may have had claims that were typical of some conceivable subgroups of the overall class, the seven named plaintiffs, collectively, did not have claims that would have been typical of the <u>entire</u> class. <u>See</u> <u>Falcon</u>, 457 U.S. at 156, 102 S. Ct. at 2370; <u>Hines</u>, 334 F.3d at 1257-58. As a result, we are constrained to conclude that the district court's conclusions regarding typicality did not constitute a clear error of judgment, nor were they otherwise outside the range of choices the district court was allowed to make.

As for the commonality requirement, the district court concluded that it was impossible to say that the employment histories of the named plaintiffs and the ways in which they claimed to have experienced discrimination could be "fairly compared with the history or individual experiences of absent class members," or that the claims of class members shared such common features that rulings could

33

be fashioned to fairly adjudicate the claims as a group. Cooper, 205 F.R.D. at 610-611. Where, as here, class certification was sought by employees working in widely diverse job types, spread throughout different facilities and geographic locations, courts have frequently declined to certify classes. See, e.g., Zachery v. Texaco Exploration & Prod., Inc., 185 F.R.D. 230, 239 (W.D. Tex. 1999) (denying certification where proposed class spread across fifteen states and involved seventeen business units); Troupe v. Randall's Food & Drug, Inc., No. CIV.A. 3:98-CV-2462, 1999 WL 552727, at *5 (N.D. Tex. July 28, 1999) (declining to certify proposed class that covered at least "fifty separate stores spread over two large cities and their outlying suburbs" with "management practices vary[ing] widely according to stores across the division").

Since the hiring, compensation, and promotion decisions at issue were made by different managers in different companies implementing different policies, even if the named plaintiffs established that they were, individually, subjected to intentional discrimination, they would not necessarily have established that other class members suffered from the same discrimination. Commonality in the claims of the broad class the plaintiffs sought to certify would have to be established by showing that the discrimination sustained was either part of an overarching pattern and practice of intentional discrimination on the part of the defendants or the

34

result of the discriminatory disparate impact of a facially neutral employment policy.

We explain the elements required to sustain a successful pattern and practice or disparate impact claim more fully in Section III.B., infra, but a brief overview suffices for our purposes here. To establish a "pattern or practice" of disparate treatment,[9] the plaintiff must show that intentional discrimination was the employer's "standard operating procedure." Joe's Stone Crab, 220 F.3d at 1274 (explaining different types of discrimination claims in context of gender discrimination). The plaintiff can prove that discrimination was the standard operating procedure "through a combination of statistics and anecdotes." Id. To prove disparate impact, a plaintiff must establish the existence of a statistically significant disparity among members of different groups affected by a type of employment decision; a specific, facially neutral employment practice involved in the decision; and a causal nexus between the facially neutral employment practice and the statistically significant disparity. Id.

---

[9]To prove disparate treatment, a plaintiff (as do plaintiffs here) usually seeks to establish that he or she is a member of a protected group; that he or she was subjected to an adverse employment decision; that the employer treated similarly situated employees outside the protected group more favorably; and that he or she was qualified for the job. Joe's Stone Crab, 220 F.3d at 1274-75.

Thus, it was plainly necessary for the district court to evaluate the statistical evidence the plaintiffs submitted in order to determine whether it established the discrimination of which plaintiffs complained. The district court concluded the statistical "analysis ha[d] some limitations which undermine[d] its usefulness in measuring whether Defendants' employment practices [we]re racially neutral." Cooper, 205 F.R.D. at 613. Because of substantial analytical flaws in the statistical evidence, the plaintiffs had made an "inadequate showing . . . to raise a presumption of discrimination arising from application of the collective whole of Defendants' compensation and promotion policies. Thus, disparate impact analysis produce[d] no evidence common to the claims of all class members. Also, the [statistical evidence] fail[ed] to establish evidence of a pattern and practice of discrimination." Id. at 615 (emphasis added).

The plaintiffs' primary statistical evidence was found in reports by Dr. Janice Madden, who analyzed employment data provided by the defendants.[10] Dr.

---

[10]The plaintiffs also submitted an expert report prepared by Dr. Kevin R. Murphy, a psychologist, who examined various affidavits and deposition testimony provided by the plaintiffs and concluded that while the defendants actually had policies in practice to prevent discrimination, they undermined these policies "by affording managers discretion to ignore those policies and use criteria that are not job related" in making compensation and promotion decisions. R119-56 at 2. In essence, Murphy's report recapitulated the basic allegations of the plaintiffs in the guise of an expert report. The defendants submitted an expert report prepared by Dr. Ronald R. Sims, which concluded that Murphy's report was "neither accurate nor reliable," R136-2 at 4, and that in fact the defendants had in place policies that prevented managers from exercising unfettered discretion to make decisions on non-job-related bases. We agree with the

36

Madden's reports  concluded that African Americans received fewer promotions than would be expected given their numbers in the workforce.  However, after analyzing Madden's methodology and conclusions, the district court identified several basic infirmities that undermined the reports' substantive value.  The district court did not exclude Dr. Madden's reports because she was unqualified or because the reports were based on a wholly unreliable methodology; rather, the court accepted the reports' conclusions but determined that they still failed to establish that the named plaintiffs had claims in <u>common</u> with other class members under either a pattern and practice or disparate impact theory.

In the first place, the district court noted that Madden's reports did not incorporate variables that would allow for the comparison of individuals who were similarly situated with respect to managerial decision makers, job types, locations, departments, and the specific criteria relevant for the jobs in question.  Madden did not tailor her analysis to the specific positions, job locations, or departmental and organizational structures in question; however, the wide-ranging and highly diversified nature of the defendants' operations requires that employee

---

district court that the reports of Murphy and Sims, which reach sweeping conclusions about what may or may not occur within the defendant companies, are of extremely limited use, lacking statistical evidence to substantiate broad claims that, in essence, simply recharge the allegations of the parties to this litigation.  <u>See</u> <u>Cooper</u>, 205 F.R.D. at 611 & n.24.

comparisons take these distinctions into account in order to ensure that the black and white employees being compared are similarly situated.  See Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 656-57, 109 S. Ct. 2115, 2124-25, 104 L. Ed. 2d 733 (1989) ("[A] Title VII plaintiff does not make a case of disparate impact simply by showing that, 'at the bottom line,' there is racial imbalance in the work force."); see also Brown v. Am. Honda Motor Co., 939 F.2d 946, 952 (11th Cir. 1991) ("Statistics . . . without a[ proper] analytic foundation[] are virtually meaningless."); Balderston v. Fairbanks Morse Engine Div. of Coltec Indus., 328 F.3d 309, 319 (7th Cir. 2003) ("The Supreme Court has emphasized the importance of looking to the proper base 'group' when making statistical comparisons and examining all of the surrounding facts and circumstances which create the statistics themselves.").

As the district court observed, Madden's reports did not take into account the type or level of acquired skills of job applicants.  Madden's "education" component failed to take into account the field of study, the relevance of that field to any position in question, or the quality of the educational institutions involved, factors which may be important in some  managers' employment decisions.

Moreover, Madden calculated "experience" only by tabulating the amount of time that had passed since an individual finished his or her formal education

38

and the amount of time that individual had spent on the defendants' payroll. That two employees completed their education in the same year does not ensure that they have similar levels of job-related experience, since what those employees have done in the intervening years may be extraordinarily different. While Madden's "experience" variable may have measured the passage of time, it did not in any way factor in the quality, type, or relevance of an employee's experience. And the reports did not factor in any employee's actual job performance, a consideration that is undeniably important in decisions relating to compensation and promotion. Indeed, without taking into account job performance at all, the fact that two employees began their employment with the defendants at the same time and have not been promoted at the same rate does not establish that discrimination is at work.

In essence, the district court concluded that these methodological deficiencies rendered it "impossible to determine what the [salary and promotions] gaps [we]re, whether they [we]re statistically significant, or whether factors other than race [we]re involved." Cooper, 205 F.R.D. at 615. Thus, the district court observed that "there ha[d] been an inadequate showing by Plaintiffs to raise a presumption of discrimination arising from application of the collective whole of Defendants' compensation and promotion policies." Id.; see also Maddox v.

39

Claytor, 764 F.2d 1539, 1552 (11th Cir. 1985) ("[Multiple regression analysis] measures the probability that the calculated disparity could occur randomly -- but the analysis in no way validates the calculation of the disparity itself. If the tested disparity is based on erroneous assumptions or suffers from flaws in the underlying data, then standard deviation analysis is foredoomed to yield an equally faulty result."); Eastland v. Tenn. Valley Auth., 704 F.2d 613, 621-24 (11th Cir. 1983).

The district court also observed that Madden's analysis of promotion rates was, similarly, grounded in insufficiently tailored data. Significantly, Madden failed to distinguish between competitive promotions -- those open to any qualified candidate -- and progressive promotions -- those available only to individual employees progressing in a "job family" -- a distinction that is crucial when analyzing promotions. See Forehand v. Fla. State Hosp., 89 F.3d 1562, 1572-73 (11th Cir. 1996). As for progressive promotions, because Madden recognized promotions only when an employee received an increase in salary grade, moved from a non-exempt to an exempt position, or moved from a union job into a higher-paying non-union job, Madden's calculations did not capture those that occurred within the same salary grade. As for competitive promotions, Madden did not take into account how many and which employees actually

40

applied for them, also a significant factor in making any meaningful generalizations about allegedly discriminatory promotion practices.

As part of her analysis, Madden divided the employees into different "pools," or subsets, of employees, and her analysis revealed statistical deficiencies in only some of the pools. Of the 148 pools of employees analyzed in 1998-1999, Madden's analysis revealed a representational deficiency of African-American employees in only three pools: two union salary-grade pools and one pool for non-exempt salary-grade-5 employees. The district court concluded that this actually could be evidence that the promotional deficiencies for African Americans may have existed only in some segments of the workforce, and therefore not throughout the entire class.

Finally, the district court observed that Madden's reports did not establish the existence of any specific promotion or compensation policy or practice, let alone trace the alleged racial disparities to such a policy or practice. In addition, the Madden reports did not make any reference to any of the specific named plaintiffs or their specific similarly-situated comparators, making it altogether

unclear how the reports could establish <u>commonality</u> among these named plaintiffs' claims and the overall claims of the affected class.[11]

The district court concluded that because of these flaws in Madden's models, it was impossible to determine how wide a real gap, if any, existed in salaries and promotion rates among white and black employees, or whether any such gap was attributable to factors other than race. We are persuaded that the district court's basic conclusion -- that plaintiffs' statistical evidence was insufficient to establish a presumption of discrimination <u>common</u> to the claims of all members of the putative class -- did not constitute a clear error of judgment, nor was the conclusion otherwise outside the acceptable range of choices.

[11]Several of the flaws in plaintiffs' statistical evidence that the district court highlighted were initially pointed out in the report of defense expert Dr. Joan G. Haworth, an economist, who included statistical analyses that contradict Madden's reports and support the defendants' claim of no discrimination. In response to these criticisms of Dr. Madden's statistical reports, the plaintiffs cite <u>Bazemore v. Friday</u>, 478 U.S. 385, 106 S. Ct. 3000, 92 L. Ed. 2d 315 (1986), which held that the failure of the plaintiffs' multiple regression analyses to incorporate all conceivable variables affected the weight of the analyses but not their admissibility. Plaintiffs argue that the district court here ignored <u>Bazemore</u> by inappropriately evaluating the probative value of the statistical evidence, rather than leaving that task to the jury.

Plaintiffs' reliance on <u>Bazemore</u> is unavailing in this case. First, <u>Bazemore</u> held that a statistical analysis should not be rejected merely because it fails to incorporate every possible variable; it did not hold that <u>any</u> statistical report, no matter how many critical variables were missing, should automatically present a jury question, indicating that there are "some regressions so incomplete as to be inadmissible as irrelevant." <u>Id.</u> at 400 n.10, 106 S. Ct. at 3009 n.10. Moreover, in <u>Bazemore</u>, the plaintiffs submitted independently conducted statistical analyses that confirmed the validity of their regressions, and most importantly, the defendants' statistical analysis reached substantially the same results as did those of the plaintiffs. <u>Id.</u> at 401, 106 S. Ct. at 3009. That was not the case here, where the defendants' analyses expressly contradicted those of the plaintiffs.

The plaintiffs also proffered, in addition to the statistical evidence, a range of anecdotal evidence that, they claimed, shed additional light on the defendants' allegedly discriminatory policies and practices. Among the evidence presented were reports of several ugly incidents involving nooses displayed at some locations within some of the defendants' facilities, reports of racial jokes and slurs, and the belief expressed by various employees that there was a "glass ceiling" for African-American employees. Finally, plaintiffs filed a series of affidavits of prospective class members who offered anecdotal evidence that repeated many of the claims plaintiffs had made in their pleadings. The district court determined that the anecdotal evidence was "inadequate to establish . . . a pattern and practice of discrimination." Cooper, 205 F.R.D. at 619. Again, we conclude that the district court acted within its discretion in determining that, given the sheer size and geographically dispersed nature of the defendants' workforce, the anecdotal evidence -- disturbing as some of it may have been -- was inadequate to establish discrimination class-wide.

After thorough review of the entire record, we conclude that the district court did not abuse its discretion in determining that the statistical and anecdotal evidence submitted by the plaintiffs did not establish pattern and practice discrimination common to the class or a common disparate impact affecting the

defendants' African-American employees class-wide. The powerful differences between the named plaintiffs' claims and the claims of the overall class members meant that procedural fairness for all members of the putative class would not be ensured if the claims of the entire class were allowed to rise or fall on the fortunes of the named plaintiffs' claims.

## C.

Even if we concluded, however, that the district court abused its discretion in determining that the plaintiffs did not meet two of the requirements of Rule 23(a), certification would still be inappropriate unless the plaintiffs also could satisfy at least one of the requirements of Rule 23(b). See Jackson v. Motel 6 Multipurpose, Inc., 130 F.3d 999, 1005 (11th Cir. 1997). As another ground for its decision, the district court concluded that certification was inappropriate under either Rule 23(b)(2) or Rule 23(b)(3). On appeal the plaintiffs say that the district court erred in refusing to certify a class under Rule 23(b)(2) for injunctive relief and back pay or to certify a hybrid class under Rule 23(b)(2) for injunctive relief, while severing the damages phase of the proceedings by allowing opt-outs for damages. They also argue that the court should have certified a class under Rule 23(b)(3) for injunctive relief, back pay, and damages. We remain unconvinced

and, accordingly, hold that the district court did not abuse its discretion in concluding that the requirements of Rule 23(b) were not satisfied either.

Under Rule 23(b)(2), class certification is appropriate when the requirements of Rule 23(a) are met and the defendant "has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). Back pay is considered equitable relief and can therefore be awarded in a case certified under Rule 23(b)(2). Pettway v. Am. Cast Iron Pipe Co., 494 F.2d 211, 257 (5th Cir. 1974).

Here, however, the plaintiffs also sought compensatory and punitive damages, legal relief that can only be awarded in a Rule 23(b)(2) class action when the damages sought are "incidental" to the claims for equitable and declaratory relief. Murray, 244 F.3d at 812. Damage claims in a Rule 23(b)(2) class action must be incidental to the equitable and declaratory relief because the basic premise of such a class action -- that class members suffer a common injury properly addressed by class-wide equitable relief -- "begins to break down when the class seeks to recover . . . monetary relief to be allocated based on individual injuries." Allison v. Citgo Petroleum Corp., 151 F.3d 402, 413 (5th Cir. 1998)

(quoting Eubanks v. Billington, 110 F.3d 87, 95 (D.C. Cir. 1997)) (internal

quotation marks omitted).

We explained in Murray those criteria used to evaluate whether money

damages should be considered "incidental" to equitable claims in a 23(b)(2) case.

In Murray, we adopted the position of the Fifth Circuit in Allison v. Citgo

Petroleum Corp.:

> By incidental, we mean damages that flow directly from liability to
> the class as a whole on the claims forming the basis of the injunctive
> or declaratory relief. . . . Liability for incidental damages should not .
> . . entail complex individualized determinations.  Thus, incidental
> damages will, by definition, be more in the nature of a group remedy,
> consistent with the forms of relief intended for (b)(2) class actions.

Murray, 244 F.3d at 812 (quoting Allison, 151 F.3d at 415).[12]  In keeping with the

requirement that monetary damages be incidental to equitable relief in Rule

23(b)(2) class actions, the advisory committee's note to Rule 23 explains that

certification under section (b)(2) is not proper in "cases in which the appropriate

---

[12]The plaintiffs say that "the question of whether claims for damages are 'incidental' to claims for injunctive relief is improper," Appellants' Brief at 22, and urge this Court to adopt the position taken by the Second Circuit, which has rejected the incidental damages standard.  See Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 167 (2d Cir. 2001).  However, Murray unambiguously explained that the Allison incidental damages standard is the proper legal standard to analyze certification under Rule 23(b)(2) in the Eleventh Circuit.  We are bound to apply the standard outlined in Murray, since one panel of this Court cannot overrule another.  That power is reserved only to the full Eleventh Circuit sitting en banc or to the United States Supreme Court.  Julius v. Johnson, 755 F.2d 1403, 1404 (11th Cir. 1985).

final relief relates exclusively or predominantly to money damages." Fed. R. Civ.

P. 23, advisory committee's note (emphasis added).

The plaintiffs argue, nevertheless, that the district court could have certified a class under Rule 23(b)(2) only as to the injunctive and declaratory prayer for relief, thereby excluding altogether the damages issues from class certification. However, to the extent the named plaintiffs were willing to forego class certification on damages in order to pursue injunctive relief that consisted of an admonition to follow general principles of settled law,[13] it is far from clear that the named plaintiffs would adequately represent the interests of the other putative class members. Indeed, to many of the class members (and especially to those who no longer work for the defendants), the monetary damages requested might be of far greater significance than injunctive relief, stated at a high order of abstraction, that simply directs the defendants not to discriminate. Moreover, determining the level of damages to which each class member was entitled plainly would require detailed, case-by-case fact finding, carefully calibrated for each

---

[13]The injunctive relief specified in the plaintiffs' Complaint consists of a request for "preliminary and permanent injunctive relief to end Defendants' discriminatory practices and to prevent current and future harm to the Named Plaintiffs and the Class." Complaint at 59. Similarly, the Complaint seeks declaratory relief in the form of a "judgment that Defendants' acts and practices as set forth herein are in violation of the laws of the United States." Id. Thus, the declaratory and injunctive relief plaintiffs seek amounts, in essence, to an order stating that the defendants discriminated against African-American employees, and enjoining them from discriminating in the future.

47

individual employee. The "complex, individualized determinations" necessary to fix the appropriate level of individual damage awards in this case are exactly the type that Murray and Allison make clear should not be considered "incidental" to the claims for injunctive and declaratory relief.[14]

Finally, as the district court noted, since the plaintiffs demanded a jury trial in this case, the parties were entitled under the Seventh Amendment to have all matters at law determined by a single jury before having decisions concerning equitable relief made by the trial court. See Cooper, 205 F.R.D. at 629 (citing Ross v. Bernhard, 396 U.S. 531, 538-39, 90 S. Ct. 733, 738, 24 L. Ed. 2d 729 (1970)). Under the circumstances of this case, even assuming that the district

---

[14]Moreover, the cases plaintiffs cite in support of their claim that the district court abused its discretion by refusing to certify an injunctive class under Rule 23(b)(2) while allowing for opt-outs on compensatory damages are inapposite. Neither Pettway, 494 F.2d at 256-60, nor Penson v. Terminal Transportation Co., 634 F.2d 989 (5th Cir. Unit B Jan. 1981), nor, finally, Holmes v. Continental Can Co., 706 F.2d 1144 (11th Cir. 1983), involved a hybrid trial in which members of an injunctive class could opt out for compensatory and punitive damages, since these remedies were not at stake in those cases. Indeed, all of these cases predate the Civil Rights Act of 1991, which changed the landscape of employment discrimination law by making available compensatory and punitive damages (as well as the right to trial by jury) in Title VII cases. We explained in Cox v. American Cast Iron Pipe Co., 784 F.2d 1546, 1554 (11th Cir. 1986) that "[a] hybrid Rule 23(b)(2) class action is one in which class members seek individual monetary relief, typically back pay, in addition to class-wide injunctive or declaratory relief." (citing Penson, 634 F.2d at 994) (emphasis added). The cases relied on by the plaintiffs stand for the proposition that it may be appropriate to use a bifurcated or hybrid trial process in Rule 23(b)(2) cases when class-wide injunctive relief is appropriate, followed by individualized awards of back pay. Significantly, these cases do not hold that such a process is appropriate (much less required, as plaintiffs would have it) when highly individualized awards of compensatory and punitive damages are at stake.

court could conduct an initial bench trial on the merits of the equitable claims, and that the court actually found in favor of the plaintiffs, it would still be necessary for a single jury to hear and rule on more than 2,000 individual claims for compensatory damages. Again, on this record we can discern no abuse of discretion in the district court's refusal to proceed under the class action umbrella.

The plaintiffs also say that even if certification under Rule 23(b)(2) was not appropriate, the district court still should have certified the class for equitable relief, back pay, and damages under Rule 23(b)(3). But, for class certification under Rule 23(b)(3) to be appropriate, common questions still must "predominate over any questions affecting only individual members" and the class action mechanism must be "superior . . . for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

We have explained that in addition to the requirements embodied in Rule 23(a), Rule 23(b)(3) "imposes two additional requirements, and increased efficiency is only one of them. Predominance is the other . . . ." Jackson, 130 F.3d at 1006. Therefore, "the issues in the class action that are subject to generalized proof and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof." Kerr v. City of W. Palm Beach, 875 F.2d 1546, 1558 (11th Cir. 1989) (citation and internal quotation

49

marks omitted). Common issues will not predominate over individual questions if, "as a practical matter, the resolution of . . . [an] overarching common issue breaks down into an unmanageable variety of individual legal and factual issues." Andrews v. Am. Tel. & Tel. Co., 95 F.3d 1014, 1023 (11th Cir. 1996). Our case law plainly establishes that a class action should not proceed under Rule 23(b)(3) when it appears that "most, if not all, of the plaintiffs' claims will stand or fall, not on the question whether [the defendant] has a practice or policy of [race] discrimination, but on the resolution of . . . highly case-specific factual issues." Rutstein, 211 F.3d at 1235 (quoting Jackson, 130 F.3d at 1006) (internal quotation marks omitted). Indeed, the predominance requirement under Rule 23(b)(3) is "far more demanding" than Rule 23(a)'s commonality requirement. Jackson, 130 F.3d at 1005 (citation and internal quotation marks omitted).

Here, the plaintiffs attempted to use statistical proof to establish the existence of a generalized policy of discrimination that provided the common thread linking together plaintiffs' otherwise disparate and individualized claims. However, we agree with the district court that substantial limitations in the plaintiffs' statistical evidence rendered the form of proof wholly insufficient to show that any pattern or practice of discrimination disparately affected the plaintiffs' class, or, for that matter, that the defendants had a general policy of

50

discrimination.  See Cooper, 205 F.R.D. at 630.  Moreover, the individual determinations on liability and damages necessary for the individual plaintiffs to succeed would require highly fact-specific inquiries concerning each plaintiff. Thus, we can discern no abuse of discretion in the district court's determination that the issues subject to individualized proof predominated over those that could be established with class-wide proof, and therefore that the Rule 23(b)(3) class action procedure would not be superior for the fair and efficient adjudication of the controversy.

## III.

## A.

Finally, we turn to the district court's orders granting summary judgment in favor of the defendants on the claims of each of the seven individual plaintiffs. We review the district court's orders granting summary judgment de novo, applying the same legal standards as the district court did and viewing all of the facts  in the light most favorable to the non-moving party.  See, e.g., Johnson v. Booker. T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is

51

entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289, 88 S. Ct. 1575, 1592, 20 L. Ed. 2d 569 (1968)). "[A]ll reasonable doubts about the facts should be resolved in favor of the non-movant." Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999) (quoting Clemons v. Dougherty County, 684 F.2d 1365, 1368-69 (11th Cir. 1982)).

B.

As we have observed, the plaintiffs claimed racial discrimination under three distinct Title VII theories: pattern and practice discrimination, disparate treatment discrimination, and disparate impact discrimination. See Joe's Stone Crab, 220 F.3d at 1273. The first two theories require the plaintiffs to prove discriminatory intent; the third does not. Id. The plaintiffs also assert claims under Section 1981, which, unlike Title VII, only provides a cause of action for claims involving intentional discrimination. Gen. Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 391, 102 S. Ct. 3141, 3150, 73 L. Ed. 2d 835 (1982); Brown, 939 F.2d at 949.

52

The basic legal framework governing these theories is by now well-established. In a disparate treatment case, the plaintiff bears the burden of proving that the  employer intentionally discriminated against him because of his race.  See Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir. 1997).  The plaintiff can establish discriminatory intent through either direct[15] or indirect evidence; to establish a prima facie case of intentional discrimination using circumstantial evidence, plaintiffs may use the framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).[16]

Again, in a "pattern and practice" disparate treatment case, "the plaintiff must prove, normally through a combination of statistics and anecdotes, that discrimination is the company's 'standard operating procedure.'" Joe's Stone

---

[15]Direct evidence is evidence which itself proves the existence of discrimination and does not require inference or interpretation, as for example a frank admission from a manager that he refused to hire an applicant because he was black or because she was female.  As would be expected, such direct evidence is encountered only infrequently, since direct evidence "is composed of only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor."  Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999) (citation and internal quotation marks omitted).

[16]The McDonnell Douglas framework for establishing a prima facie case is used in intentional discrimination cases brought under either Title VII or Section 1981.  Sledge v. Goodyear Dunlop Tires N.A., Ltd., 275 F.3d 1014, 1015 n.1 (11th Cir. 2001).  Under McDonnell Douglas, a plaintiff may establish a prima facie case of discrimination in promotion by establishing that (1) he belongs to a racial minority; (2) he was qualified for and applied for a position the employer was trying to fill; (3) he was denied the position; and (4) others who were not members of the protected class were hired, or the employer continued to seek applicants with the plaintiff's qualifications.  411 U.S. at 802, 93 S. Ct. at 1824.

Crab, 220 F.3d at 1274 (citation omitted). "To meet this burden of proof, a plaintiff must 'prove more than the mere occurrence of isolated or accidental or sporadic discriminatory acts. It ha[s] to establish by a preponderance of the evidence that . . . discrimination [is] . . . the regular rather than unusual practice.'" Id. at 1286-87 (quoting Teamsters, 431 U.S. at 336, 97 S.Ct. at 1843).

To state a claim under a disparate impact theory, in contrast, a plaintiff need not establish that he suffered intentional discrimination. Rather, "disparate impact theory prohibits neutral employment practices which, while non-discriminatory on their face, visit an adverse, disproportionate impact on a statutorily-protected group." Id. at 1274. We have noted that the disparate impact theory is "a doctrinal surrogate for eliminating unprovable acts of intentional discrimination hidden innocuously behind facially-neutral policies or practices." Id.

Thus, to state a prima facie case of disparate impact discrimination, a plaintiff must establish that (1) there is a significant statistical disparity among members of different racial groups; (2) there is a specific, facially-neutral employment policy or practice; and (3) there is a causal nexus between the specific policy or practice and the statistical disparity. Id. Moreover, in order to satisfy the third, critical requirement, a plaintiff "must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the

54

exclusion of applicants for jobs or promotions because of their membership in a protected group." Id. at 1274-75 (citation and internal quotation marks omitted).

In general terms, disparate impact cases are more amenable than other types of discrimination claims to class treatment, since they arise out of specific policies or practices that have a disproportionate impact on an entire class of employees. In contrast, when disparate treatment is the basis of a class action, it is generally more likely that individual issues will predominate and make proceeding in a class action format inappropriate. See, e.g., Reyes v. Walt Disney World Co., 176 F.R.D. 654, 658 (M.D. Fla. 1998) (explaining that disparate treatment claims are inherently "highly individualized" and where employees worked in different divisions with different structures and decision makers, each plaintiff was subject to his "own set of unique circumstances surrounding the adverse employment action about which they now attempt to collectively complain").

In a discrimination action brought under either Title VII or Section 1981, a plaintiff must first establish a prima facie case of discrimination, which the defendant can rebut by offering a legitimate, non-discriminatory reason for the allegedly discriminatory act. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 2106, 147 L. Ed. 2d 105 (2000). "In other words, the defendant must produc[e] evidence that the plaintiff was rejected, or someone

else was preferred, for a legitimate, nondiscriminatory reason." U.S. Postal Serv.

Bd. of Governors v. Aikens, 460 U.S. 711, 714, 103 S. Ct. 1478, 1481, 75 L. Ed.

2d 403 (1983) (citation and internal quotation marks omitted). "It is important to

bear in mind . . . that the defendant's burden of rebuttal is exceedingly light . . . .

At this stage of the inquiry, the defendant need not persuade the court that its

proffered reasons are legitimate; the defendant's burden is merely one of

production, not proof." Perryman v. Johnson Prods. Co., 698 F.2d 1138, 1142

(11th Cir. 1983) (citation and internal quotation marks omitted).[17]

If the defendant successfully rebuts the plaintiff's prima facie case, "the

presumption of discrimination is eliminated." Chapman v. AI Transp., 229 F.3d

---

[17]The plaintiffs argue, however, that the McDonnell Douglas burden-shifting analysis applied to claims of employment discrimination was radically revised by the Supreme Court in Desert Palace, Inc. v. Costa, 539 U.S. 90, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003). According to the plaintiffs, Desert Palace overruled McDonnell Douglas and its progeny, so that "once a plaintiff establishes a prima facie case of discrimination, a defendant may no longer simply articulate a legitimate, non-discriminatory reason for the adverse employment action, but rather must prove that it would have taken the same action absent the alleged discrimination." Appellants' January 9, 2004 Notice of Supplemental Authority at 1.

The plaintiffs read Desert Palace too broadly. While it is true that some courts have suggested that Desert Palace may spell the end of the McDonnell Douglas burden-shifting analysis, see, e.g., Dare v. Wal-Mart Stores, Inc., 267 F. Supp. 2d 987, 990-91 (D. Minn. 2003), the Desert Palace holding was expressly limited to the context of mixed-motive discrimination cases under 42 U.S.C. § 2000e-2(m). Indeed, the Court explained that it did not decide whether its analysis applied in other contexts. Desert Palace, 539 U.S. at 94 n.1, 123 S. Ct. at 2151 n.1. Moreover, the fact that the Court did not even mention McDonnell Douglas in Desert Palace makes us even more reluctant to believe that Desert Palace should be understood to overrule that seminal precedent. Finally, after Desert Palace was decided, this Court has continued to apply the McDonnell Douglas analysis in non-mixed-motive cases. See, e.g., Maynard v. Bd. of Regents, 342 F.3d 1281, 1289-90 (11th Cir. 2003).

1012, 1024 (11th Cir. 2000) (en banc).  To survive summary judgment, the plaintiff must then "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."  Id. (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997) ); see also  Reeves, 530 U.S. at 143, 120 S. Ct. at 2106; Perryman, 698 F.2d at 1142.  To show that the employer's reasons were pretextual, the plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  Combs, 106 F.3d at 1538.  "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim."  Chapman, 229 F.3d at 1024-25; see also Combs, 106 F.3d at 1529 (explaining that the plaintiff must present "sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action").

The plaintiffs argue that they have presented sufficient statistical evidence in support of their pattern and practice and disparate impact claims to raise genuine issues of material fact, and thus to defeat summary judgment. In contrast to the individual claims of disparate treatment, which we address infra, the pattern and practice and disparate impact claims depend on the same body of statistical evidence. Accordingly, these claims stand or fall in concert.

As we have observed at some length, the statistical evidence consists primarily of two expert reports authored by Dr. Janice Madden. However, Dr. Madden's reports were not sufficiently tailored to compare similarly situated employees. They failed to effectively measure job-related skills, education, experience, and job performance, using only broad, imprecise measurements as proxies for work experience. Nor did the reports sufficiently narrow the classes of employees who were compared, instead using company-wide data that did not reliably identify discrimination within designated segments of the workforce. And, as we have observed, the reports did not distinguish between competitive and non-competitive promotions, did not capture in-grade progressive promotions and did not measure outcomes for employees who actually applied for promotions as opposed to those who did not.

After reviewing this body of statistical evidence, we agree with the district court that basic analytical deficiencies in the reports render them insufficient to support a conclusion that intentional discrimination was the defendants' standard operating procedure. Even if we accept all the calculations underlying Madden's reports as correct, the reports' conclusions are of very limited value because the data on which those calculations were based was not meaningfully tailored. That is, even crediting as true the conclusions, we do not believe that a jury reasonably could infer, based on the evidence, that the plaintiffs established a pattern and practice claim. Summary judgment was therefore properly entered for the defendants as to the plaintiffs' discriminatory pattern and practice claims.

Moreover, the district court properly entered summary judgment for the defendants on the disparate impact claims. The plaintiffs say they identified a statistical disparity between white and black employees, along with a facially neutral employment practice -- the use of subjective hiring criteria by the defendants -- that has caused this disparity. First, however, a substantial question exists as to whether the plaintiffs' statistical evidence is sufficiently tailored to establish statistical disparities within the specific segments of the defendants' workforce in which the individual plaintiffs worked. See, e.g., Maddox, 764 F.2d at 1549-50. But even assuming that the plaintiffs had met this requirement, they

59

have failed to demonstrate a causal nexus between any statistical disparities in the defendants' workforce and the practice of using partially subjective hiring criteria by some managers in some of the defendants' facilities. See, e.g., Wards Cove Packing, 490 U.S. at 651-55, 109 S. Ct. at 2121-24. Accordingly, the district court did not err in entering summary judgment for the defendants on the plaintiffs' disparate impact claims.

We turn, then, to the arguments mounted by each plaintiff concerning his or her disparate treatment claims.

## C. Cornelius Cooper

Cooper asserts that the district court erred by entering final summary judgment in favor of the defendants on his individual disparate treatment claims.[18] Specifically, Cooper argues that the district court erred in entering summary judgment against him as to the denial of two promotions in 1998, one to a Lighting

---

[18]The district court granted summary judgment in favor of defendant SCES on the ground that Cooper had abandoned any claims against SCES, and in favor of TSC and SCS because Cooper was never an employee of these defendants. R301 at 1-2; see Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1242 (11th Cir. 1998) (explaining that a plaintiff must be an employee to bring an employment discrimination lawsuit). As for GPC, the district court found that although Cooper had been an employee of that defendant, his claims failed for other reasons. While Cooper's arguments on appeal are phrased in terms of "the defendants" and "Southern" generally, in substance they are directed to the district court's analysis of his claims against GPC. To the extent that Cooper argues that TSC and/or SCS were "joint employers," we are unpersuaded and conclude that Cooper was an employee of GPC only. Accordingly, we affirm the district court's entry of summary judgment against Cooper and in favor of TSC, SCES, and SCS.

Coordinator position and the other to a Trainer position.[19]  Cooper also argues that

the district court erred in excluding an expert report which, he claims, would have

established that it was highly unlikely that the selection process used to deny him

his position was "race blind."

Cooper first says that he established pretext as to the denial of a Lighting

Coordinator job within GPC's Lighting Services Business Unit ("LSBU").

Lighting Coordinators at GPC are involved in selling outdoor lighting systems and

overseeing the installation and maintenance of these systems by outside

contractors.  Cooper was one of more than fifty applicants for two Lighting

Coordinator positions posted on the defendants' JobNet system in 1998, but was

---

[19]In a notice of supplemental authority, the plaintiffs claim that under Jones v. R.R. Donnelley & Sons Co., ___ U.S. ____, 124 S. Ct. 1836 (2004), the district court erroneously applied a two-year statute of limitations to the plaintiffs' Section 1981 claims, thus barring claims based on events that occurred more than two years before this lawsuit was filed (for example, claims based on Cooper's being denied promotions more than two years before suit was filed).  While it is true that the Supreme Court held in Jones that claims made possible by the amendment to Section 1981 in the Civil Rights Act of 1991 were governed by the four-year federal "catch-all" statute of limitations, the plaintiffs are barred from arguing that their claims are governed by a four-year limitations period because they have waived the issue.  The plaintiffs did not argue in the district court, or, indeed, in their briefs submitted to this court that a four-year limitations period applied to their claims, and "parties cannot properly raise new issues at supplemental briefing, even if the issues arise based on the intervening decisions or new developments cited in the supplemental authority."  United States v. Nealy, 232 F.3d 825, 830 (11th Cir. 2000).  As our case law makes clear, parties "must submit all issues on appeal in their initial briefs.  When new authority arises after a brief is filed, this circuit permits parties to submit supplemental authority on intervening decisions or new developments regarding issues already properly raised in the inital briefs."  Id. (citations and internal quotation marks omitted) (final emphasis added); see also United States v. Padilla-Reyes, 247 F.3d 1158, 1164 (11th Cir. 2001) ("Because this issue is raised for the first time in supplemental briefing, we deem it waived.").

denied an interview for the position. He established a prima facie case that the denial of the promotion was discriminatory, but the district court concluded he had failed to show that the legitimate, non-discriminatory reasons for GPC's denying him the promotion were pretextual.

We dispense first with Cooper's suggestion that statistical evidence found in the declaration of expert John Del Roccili raised a genuine issue of material fact concerning whether the interview selection process used by GPC was race blind. The district court excluded Del Roccili's declaration after finding that the plaintiffs had not properly identified Del Roccili as an expert or provided a statement of his intended testimony, as required by Rule 26 of the Federal Rules of Civil Procedure. The district court also held that, to the extent the plaintiffs sought to use Del Roccili as a fact witness, his declaration was inadmissible because he lacked personal knowledge of the data about which he opined.

We review the district court's decision to exclude Del Roccili's declaration for abuse of discretion, see Benson v. Tocco, Inc., 113 F.3d 1203, 1208 (11th Cir. 1997), and conclude that the district court clearly acted within its discretion here. Under Federal Rule of Civil Procedure 26, all parties must disclose expert opinion reports when directed by the court, or at least 90 days before trial. These reports must contain "a complete statement of all opinions to be expressed and the basis

62

and reasons therefor." Fed. R. Civ. P. 26(a)(2)(B). Under Rule 37(c)(1) of the Federal Rules of Civil Procedure, a party "that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) . . . is not, unless such failure is harmless, permitted to use as evidence at a trial . . . any witness or information not so disclosed." Fed. R. Civ. P. 37(c)(1).

In this case, plaintiffs originally represented that Del Roccili was a fact witness, but later identified him as an expert witness in response to defendants' discovery requests. However, the plaintiffs never provided defendants with an expert report containing Del Roccili's opinions or, for that matter, the bases for his opinions, as required under Rule 26. Because the expert witness discovery rules are designed to allow both sides in a case to prepare their cases adequately and to prevent surprise, see Sherrod v. Lingle, 223 F.3d 605, 613 (7th Cir. 2000), compliance with the requirements of Rule 26 is not merely aspirational.

Plaintiffs have identified Del Roccili as "an expert in extracting and analyzing data from human resources databases," R282 at 2, and in his declaration, Del Roccili extracted substantial data from the defendants' databases, performed statistical probability calculations, and expressed opinions about the significance of these calculations. While we do not evaluate the reliability of DelRoccili's opinions, the techniques utilized and opinions presented plainly require the kind of

63

technical or specialized knowledge that is the hallmark of expert evidence.  See

Fed. R. Evid. 702. We therefore conclude that Del Roccili's declaration was

properly construed as an expert report and, thus, because the plaintiffs failed to

comply with the explicit requirements of Rule 26, it was within the sound

discretion of the trial judge to sanction plaintiffs for their failure to disclose by

enforcing the unambiguous terms of Rule 37(c).  See Firefighters' Inst. for Racial

Equality ex rel. Anderson v. City of St. Louis, 220 F.3d 898, 902 (8th Cir. 2000).

Cooper claims, however, that he has demonstrated pretext even in the

absence of Del Roccili's declaration.  We remain unpersuaded.  It is undisputed

that LSBU Sales Manager Mike Clay was responsible for choosing for interviews

applicants who had applied for the Lighting Coordinator positions.  After

receiving more than 50 applications for the openings, Clay reviewed a computer-

generated list of applicants, including a candidate profile listing each applicant's

work history.  Clay reviewed the applicant profiles and selected candidates to

interview based on the following specific job-related criteria: applicants needed at

least two years of experience in power delivery; demonstrated communication,

leadership and teamwork skills; experience in contract administration and

contractor supervision; and experience as a foreman.  Clay also considered

applicants whom he knew personally, for whom he had received

recommendations, and who had taken initiative by expressing specific interest in learning more about the Lighting Coordinator positions. Clay stated that he did not select Cooper for an interview because (1) Cooper lacked any experience as a foreman; (2) Cooper was not known personally to Clay; (3) Cooper had not been recommended; and (4) Cooper had not contacted Clay or other members of the LSBU regarding the positions.

Cooper contends that Clay's stated reliance on recommendations was pretextual. Because the JobNet posting did not require applicants to submit a recommendation, Cooper says that Clay's use of this non-posted requirement created an "informal, secretive and subjective . . . promotion decision process[ which] tend[ed] to facilitate the consideration of impermissible criteria." Roberts v. Gadsden Mem'l Hosp., 835 F.2d 793, 798 (11th Cir. 1988). We are unpersuaded that Clay's use of applicant recommendations as one factor -- among other, clearly job-related factors -- in determining who would be interviewed was a pretext for a secretive, subjective, and discriminatory process. Moreover, GPC has offered evidence that one preferred qualification was that an applicant had previously served as foreman -- a legitimate, job-related requirement -- and Cooper had not served as a foreman. In short, Cooper has not shown that GPC's proffered, legitimate reasons for denying him an interview were "unworthy of

credence." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256, 101 S. Ct. 1089, 1095, 67 L. Ed. 2d 207 (1981).

Cooper also claims that he was discriminated against on account of race when he was denied a non-union job as a Trainer, and that he has raised a genuine question that the legitimate reasons provided for the denial of this job were also pretextual. Trainers work with line crew employees, instructing them on safety techniques and job-related skills through hands-on training. The defendants maintain that, in addition to requiring technical knowledge, the Trainer position requires significant communication skills, since Trainers must be able to teach their charges efficiently. The hiring manager in charge of filling the Trainer vacancies, Francis Howard, stated that he did not select Cooper because he believed Cooper did not possess superior communication skills, job knowledge, experience, teamwork skills, and peer credibility. Howard also said that he learned from other members of the Screening Committee that Cooper had experienced difficulty articulating training instructions to student employees when he served as a guest instructor at the Training Center. See R-204-2 at 10.

Cooper responds that he did have the necessary communication and other skills. However, the crucial question here is not whether Cooper fulfilled the requirements, but whether Howard honestly believed that Cooper did not meet the

66

criteria.  See Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991).  Cooper does not dispute that some selection committee members told Howard that Cooper had trouble articulating instructions to trainees when he served as guest trainer.  Nor has Cooper presented any evidence suggesting that Howard did not genuinely believe that Cooper did not posses the requisite job skills.

Moreover, Howard testified that he honestly believed Cooper did not have up-to-date job knowledge of overhead lines at the time trainers were hired.  Howard drew this conclusion because Cooper only had experience in underground cable repair during the two years preceding his Trainer application.  Cooper says that because GPC was filling both overhead and underground Trainer positions, this reason is also pretextual.  Again, however, Cooper has presented no evidence suggesting that Howard did not honestly believe a trainer required up-to-date knowledge of all line crew work, including overhead and underground cable repair.

Finally, Cooper challenges Howard's explanation that Cooper lacked peer credibility and teamwork skills.  But here, again, Cooper's argument that he indeed possessed these attributes is wide of the mark:  Cooper has offered no evidence that Howard did not honestly believe this.  Short of some evidence that

Howard did not genuinely believe the legitimate reasons, on this bare record we will not second-guess Howard's honest assessment of Cooper's qualifications. See id. ("Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions. . . . Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior." (citation and internal quotation marks omitted)). "We do not ask whether the employer selected the 'most' qualified candidate, but only whether it selected the candidate based on an unlawful motive." Denney v. City of Albany, 247 F.3d 1172, 1188 (11th Cir. 2001) (citation omitted). And even if Cooper could discredit one of the reasons Howard offered for not hiring him, it would still not establish pretext, because to do so, Cooper would have to establish that each of Howard's reasons was pretextual. See Chapman, 229 F.3d at 1024-25 ("If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." (emphasis added)). This he has failed to do.

In short, because Cooper has not raised a genuine issue of material fact as to each of the legitimate reasons proffered for why he was not offered the Lighting

Coordinator or Trainer position in 1998, the district court did not err in awarding GPC final summary judgment.

## D. Michael Edwards

The plaintiff Edwards complained that he suffered discrimination when his managers at GPC denied him numerous promotions. On appeal, he alleges the district court erred in its review of the denial of four specific promotions for which he applied.[20] Edwards maintains that it was on account of race that GPC declined to offer him a promotion to a Cable Locator position in April 2000; to an Operator I job in March 2000; to an Operating Service Representative position in June 1999; and to a Power Delivery Supervisor position, also in 1999.[21] The district court concluded that Edwards failed to show that the legitimate, non-discriminatory explanations offered for hiring other candidates were pretextual. We agree.

---

[20]Edwards argues repeatedly that "Southern" denied him various promotions; in actuality, managers at GPC declined to promote him. Because Edwards was never an employee of TSC, SCES, or SCS, we affirm the district court's grant of summary judgment in favor of these defendants. See Llampallas, 163 F.3d at 1242; supra note 18. The remainder of our analysis evaluates whether summary judgment was properly granted as to defendant GPC.

[21]Because Edwards only offers arguments related to the denial of these four specific promotions, he is deemed to have abandoned any claims concerning any other allegedly discriminatory denials of promotion. See, e.g., Access Now v. Southwest Airlines, Inc., __ F.3d ____, 2004 WL 2113022, at *6 (11th Cir. Sept. 24, 2004); United States v. Jernigan, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003).

During his 13 years at GPC, Edwards worked in a range of different union positions, at a range of locations. Between 1987 and December 1990, Edwards served as Laborer in the Nuclear Operations area of a plant in Waynesboro, Georgia. After leaving that position, he served until July 1993 as a Line Crew Helper in Augusta, Georgia, before working as an Apprentice Lineman in Hinesville, Georgia until April 1996. Beginning at that time, Edwards worked as a Lineman based in Tucker, Georgia. While Edwards progressed through these various positions during his tenure at GPC, he complains that several promotions he sought in 1999 and 2000 were denied him on account of race.

We begin with GPC's decision not to offer him a Cable Locator position in April 2000. After suffering various injuries that interfered with his working as a Lineman -- including a severe thumb injury and damage to his back -- and after taking various medical leaves and light-duty assignments, Edwards received an assignment as a temporary cable locator in November 1999. In that capacity, Edwards reported to James Weldon, GPC's Cable Locating Manager, and was responsible for locating underground electrical cable while facilitating engineering, construction, and other projects. After working as a temporary Cable Locator for four or five months, Edwards applied for a full-time Cable Locator position in early April 2000.

Weldon was the hiring manager for the permanent Cable Locator position, and he chose seven individuals, including Edwards, for interviews. Along with a Human Resources Representative who worked as a facilitator, Weldon assembled an interviewing panel that included, in addition to Weldon, a white woman, a white man, and a black man. The interview panel spoke with each of the seven applicants individually, rating their responses to six structured, job-related questions on a scale of 0 to 3. After all of the interviews were completed, the four interviewers ranked the applicants based on their "gut feel," and Edwards scored very highly. Subsequently, the scores assigned to each candidate, based on their answers to the six questions, were tallied. The top three candidates, based on these aggregate scores, were Jim Brown (69 points), Carey Rutledge (62.5 points), and the plaintiff Edwards (61 points). The committee then discussed the three "finalists." One of the interviewers explained that she had reservations about Edwards's job performance in his capacity as a temporary Cable Locator. She said she had frequently seen Edwards in the office socializing and speaking on the phone, while other employees were in the field. Moreover, she felt that Edwards had not performed well in his interview.

The committee recommended not offering the job to the most highly ranked applicant (Brown) because he had expressed doubt that he would accept the job

even if it were offered to him. The members of the committee then agreed to recommend that the position be offered to Rutledge, whose aggregate interview score was slightly higher than that of Edwards. Rutledge had previous work experience related to the Cable Locator position, interviewed effectively, and was familiar with the equipment used in the position. Rutledge accepted the offer.

Edwards claims that the reasons GPC advances for offering the job to Rutledge must be pretextual because the hiring manager, Weldon, testified that Edwards was well qualified, because GPC only revealed the job-performance concerns of the committee member in its summary judgment motion, rather than at the earliest stages of discovery, and because Edwards was better qualified for the position than Rutledge.

The relevant issue here, however, is not whom we would determine to be better qualified for the job. See Elrod, 939 F.2d at 1470. Again, we do not sit in judgment of the wisdom of an employer's selection. Edwards "cannot . . . establish pretext simply by showing that [he] is more qualified than [Rutledge]. Rather, [Edwards] must adduce evidence that the disparity in qualifications is 'so apparent as virtually to jump off the page and slap you in the face.'" Cofield v. Goldkist, Inc., 267 F.3d 1264, 1268 (11th Cir. 2001) (quoting Denney, 247 F.3d at 1187); see also Lee v. GTE Fla., Inc., 226 F.3d 1249, 1253-54 (11th Cir.

2000).  This principle "should be understood to mean that disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question."  Lee, 226 F.3d at 1254 (quoting Deines v. Texas Dep't of Protective & Regulatory Servs., 164 F.3d 277, 280-81 (5th Cir. 1999)) (internal quotation marks omitted).

On this record, the evidence is insufficient to raise a genuine issue of fact as to whether GPC's stated reasons for promoting Rutledge instead of Edwards are pretextual.  Edwards has not offered evidence showing that he was "so clearly more qualified for the position than [Rutledge] that a reasonable juror could infer discriminatory intent from the comparison."  Id. at 1255.  Indisputably, Rutledge received a higher aggregate score than Edwards on his interview, Rutledge had relevant job experience and familiarity with the work required of a Cable Locator, and at least one committee member believed that Edwards had adopted an inappropriate demeanor during his interview and had questionable work habits. The evidence was not sufficient to show a disparity between Edwards's qualifications and Rutledge's so great that a jury could infer the committee did not honestly believe Rutledge was more qualified.  See id.

Moreover, because the plaintiffs' Complaint listed only the Cable Locator position, the district court observed that Edwards was limited to pursuing only that claim. Out of "an abundance of caution," however, the district court addressed several other claims raised by Edwards. It need not have done so. Any claims not asserted in the plaintiff's Complaint are properly dismissed. See Coon v. Ga. Pac. Corp., 829 F.2d 1563, 1568-71 (11th Cir. 1987).[22] Yet even if Edwards had included the remaining three promotion denials in the Complaint, summary judgment still would have been properly granted in favor of GPC, because Edwards did not establish pretext as to any of those employment decisions.

First, Edwards says that he was more qualified than the two white candidates who were offered Operator I positions in March 2000, but he has failed to demonstrate a disparity between him and them so great that a factfinder could infer discrimination from the decision not to promote. Moreover, some of the evidence Edwards relied upon is taken from performance evaluations completed after the successful applicants had already begun working in the Operator I positions. Isolated negative comments in these evaluations cannot support an

---

[22]Furthermore, several of the claims not included in the Complaint, but asserted in discovery, occurred more than 180 days before Edwards filed a complaint with the EEOC. Those claims were, therefore, barred by Title VII's statute of limitations. See 42 U.S.C. § 2000e-5(e)(1); Stewart v. Booker T. Washington Ins., 232 F.3d 844, 848 (11th Cir. 2000).

inference that those charged with filling the openings declined Edwards's application because of race.

As for the Operating Service Representative promotion Edwards was denied in June 1999, Edwards claims that the district court erred by basing its decision on "inadmissible hearsay." Appellants' Brief at 69. The alleged hearsay was a statement by a member of the selection committee, David Keenum, that, to his knowledge, the hiring manager, Bob Davidson, chose the white candidate because he believed the white candidate was the best-qualified candidate for the position. Regardless of whether this statement is fairly characterized as hearsay, Edwards failed to present any evidence to challenge GPC's evidence that the successful candidate was hired based on his interview performance and extensive experience related to the position. The successful candidate, Gary E. Miller, was a long-term employee of GPC who had extensive experience in metering and power delivery. He was recommended by the interview committee as one of the most qualified candidates for the Operator Service Representative position Edwards had sought. Moreover, Edwards has not undermined GPC's evidence that his race was unknown during the selection process, rendering untenable the suggestion that he was denied the position because of his race.

Finally, Edwards has not established pretext concerning his failed application for the Power Delivery Supervisor position in February 1999.  GPC maintains that Edwards was not selected for an interview because his application did not reflect familiarity with the repair shop operations or any mechanical background.  In contrast, the successful candidate, Al R. Kuzava, was the consensus recommendation of the interview committee, having been deemed the most qualified for the position based on his extensive repair shop and mechanical experience, his substantial experience as a journeyman, and his demonstrated leadership skills, all job-related skills identified by the hiring manager, Mark Edward Cawthon, as prerequisites for the job.  Our review of the record confirms that the successful candidate had extensive mechanical and repair shop experience, and that Edwards's application lacked any indication that he had familiarity with repair shop operations.  Accordingly, Edwards has failed to cast doubt on the legitimate reasons proffered by GPC for denying him the Power Delivery Supervisor position.

In short, we find no reversible error in the decision to grant summary judgment in favor of GPC.

E.  Charcella Green

76

Plaintiff Green contends that she was discriminated against as to both promotion and compensation, and she challenges the district court's entry of summary judgment against her on both claims.[23]  We turn, first, to Green's arguments concerning her promotion discrimination claim, stemming from the denial of a Manager of Education Services position in 1998.[24]

The district court determined that summary judgment was appropriate on Green's promotion claim because, having accrued more than two years before this lawsuit was filed, the claim was time-barred.  Green maintains, however, that the district court erred in calculating when her promotion claim accrued.  The district court also found that the claim failed on the merits.  Because we agree that Green's promotion claim was time-barred, we need not reach the merits of her claim.

The district court applied a two-year statute of limitations to Green's Section 1981 promotion claim, determining that, to be timely, Green's claim had

_____

[23]Green's arguments on appeal are directed to "Southern" and "the defendants," but Green was specifically employed by GPC.  Because Green was never an employee of TSC, SCES, or SCS, we again affirm the district court's grant of summary judgment in favor of these defendants. See Llampallas, 163 F.3d at 1242; supra note 18.  The remainder of our analysis is directed to whether summary judgment was properly granted to defendant GPC.

[24]Green offers no arguments as to the entry of summary judgment against her on her claims relating to bonuses or promotions other than the Manager of Education Services position.  Accordingly, she is deemed to have abandoned any claims other than those based on compensation and the denial of the education manager position.  See, e.g., Access Now, ___ F.3d at ____, 2004 WL 2113022, at *6; Jernigan, 341 F.3d at 1283 n.8.

to accrue after July 28, 1998. See R-303 at 8 (citing Hill v. Metro. Atlanta Rapid Transit Auth., 841 F.2d 1533, 1546 (11th Cir. 1988)). Green did not contest the applicability of this two-year statute of limitations before the district court or in the briefs submitted to this Court, and therefore has waived any challenge to the district court's use of a two-year limitations period. See supra note 19. The limitations period begins to run when the facts that will support a claim are apparent, or should be apparent to a person with a reasonably prudent regard for her rights. See Everett v. Cobb County Sch. Dist., 138 F.3d 1407, 1410 (11th Cir. 1998). Therefore, if Green knew or should have known before July 28, 1998 that she had been denied the Manager of Education Services position because of race, her promotion claim was time-barred.

As the district court noted, Green's deposition testimony reveals that she learned in early July 1998 that the educational manager position she had applied for had been given to Pamela Thomas, a white employee. When deposed, Green stated that the position had been filled "either toward the end of June or the first part of July [1998]." R137-R at 254. Green testified that she received a voice mail stating that Ms. Thomas had been hired "about two days" before a performance review that was held on July 15, 1998. Id. at 180-82. Green also testified that shortly after finding out Ms. Thomas had been hired, she expressed her concern

78

about not being given the position to administrators at GPC, including the administrators conducting her performance review on July 15, 1998. Id. Moreover, Green stated that when she applied for the opening she knew she was the most qualified person for the job, indicating her belief that the successful candidate was, in fact, less qualified. In her deposition, Green also stated that she began to suspect she was a victim of racial discrimination as early as 1996. The two-year limitations period ended at the latest in mid-July 2000, some two weeks before this suit was commenced. Thus, the trial court properly determined that the promotion claim was time-barred.

Green also argues that the district court erred by entering a final order of summary judgment against her on the compensation claims. Green says she was discriminated against on account of race in that she was paid less than white co-workers who performed similar jobs. To state a prima facie case of intentional discrimination in compensation, a plaintiff must establish that (1) she belongs to a racial minority; (2) she received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) she was qualified to receive the higher wage. See Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1528 (11th Cir. 1992) (compensation discrimination by gender); MacPherson v. Univ. of Montevallo, 922 F.2d 766, 774 (11th Cir. 1991)

(compensation discrimination by age). The comparators must perform jobs similar to the plaintiff's; thus, the plaintiff must show that, in her job, she "shared the same type of tasks" as the comparators. B&B Cash Grocery, 975 F.2d at 1529.

It is undisputed that Green began working for GPC as an intern in 1983, later becoming a full-time, regular employee and continuing at GPC for several years. In October 1996, while Green was working at GPC's Shenandoah Center, an environmental education center, GPC underwent a corporate restructuring that closed the Shenandoah Center. Green was then transferred to GPC's Community and Economic Development Department ("CEDD"), where she claims she began suffering discrimination in compensation.

After the 1996 corporate restructuring, Green accepted a position as an Education Advisor within the CEDD. She claims she was compensated on less favorable terms than white colleagues who served as Urban Advisors or Community Advisors, positions that Green claims are equivalent to Education Advisor. Indeed, Urban, Community, and Education Advisors are all classified within the defendants' employment database as "ADO Advisors," but GPC asserts that Urban and Community Advisors are not appropriate comparators because the jobs they perform are notably different from those of Education Advisors. GPC

80

relies on this distinction because it is undisputed that white Community and Urban Advisors are compensated more generously than is Green.

GPC Vice President Rebecca Blalock and CEDD administrator Lamar Norton testified that, during GPC's corporate restructuring, pay grade ranges were set by performing a market review to compare new positions to similar positions in the region. According to Blalock, this survey revealed that the market value of Education Advisors was less than that of Community and Urban Advisors within the CEDD, leading GPC to classify Education Advisors at pay grades E3 to E5, but Community and Urban Advisors at grades E5 to E7. GPC maintains that this distinction justifies the lesser salaries for Green and other Education Services employees, as compared to the Community and Urban Advisors.[25]

There is a substantial question whether Green has established a prima facie case of compensation discrimination, because it is not clear that the Community and Urban Advisors Green uses as comparators are similarly situated in all relevant respects. See MacPherson, 922 F.2d at 774 n.16 ("In a comparator

---

[25]Green introduced evidence of a 1996 market survey, the "Hay survey," which she alleges is the survey GPC relied upon in assigning salary grades to the various positions within the CEDD. Because this survey does not mention any ADO Advisor positions, Green maintains that GPC's alleged reliance on a market survey is not credible, and thus that the proffered justification is pretextual. However, the Hay survey was conducted after Green's salary was fixed, and could not have been the survey upon which GPC relied. Indeed, Blalock testified that this was not the survey used in setting the salary grades for Green and her colleagues in the CEDD.

81

analysis, the plaintiff is matched with a person or persons <u>who have very similar job-related characteristics and who are in a similar situation</u> to determine if the plaintiff has been treated differently than others who are similar to him." (emphasis added)). Even assuming, however, that the different Advisors are proper comparators, <u>see</u> <u>B&B Cash Grocery</u>, 975 F.2d at 1529, Green has not established that the legitimate reason advanced by GPC for the pay disparity is really a pretext for race discrimination. Green has not demonstrated that GPC's stated reliance on a market survey to classify Education Advisors' salary levels was false or otherwise shown that race discrimination motivated the salary structure. Indeed, when GPC classified Education Advisors in the E3 to E5 pay grade range, <u>all</u> Education Advisors were so classified -- including Green and at least two white colleagues.[26] The fact that Green's two white colleagues were paid according to the same scale undermines Green's pretext argument.

In short, as to her compensation claim, Green has failed to introduce sufficient evidence to raise a material question on the issue of pretext.

## F. Patricia Harris

---

[26]In fact, Green was classified at grade E5, the highest possible grade for the Education Advisor position. When Green transferred to the CEDD as an Education Advisor, she retained the E5 grade from her previous position. In contrast, her former supervisor, John Thrasher (a white employee), who also became an Education Advisor after the restructuring, accepted a demotion and salary grade reduction by two levels to retain his employment at GPC. In 1997, Thrasher was transferred from the Education Advisor position to a Community Advisor position.

P. Harris argues that the district court erroneously entered summary judgment against her on her Section 1981 claim of discrimination in compensation.[27] The district court concluded that, while P. Harris had established a prima facie case of compensation discrimination, she failed to raise an issue of fact concerning the legitimate reasons the defendants offered to explain the differences in her salary and those of her white colleagues. We agree.

P. Harris began working for GPC in June 1990, when she was offered a Secretary III position on a contract basis. She became a full-time, regular GPC employee on July 1, 1991, when she accepted a Senior Secretary position. Between 1993 and 1997, P. Harris worked for GPC as a Research Analyst in the Competitve Intelligence Department, before taking a job as an Economic Development Analyst in the Economic Research Department.

In the summer of 1997, P. Harris applied for a position as Market Research and Support Analyst in the Atlanta, Georgia offices of SCS. She contends that she was discriminated against when, on account of race, her manager at SCS set her

---

[27]P. Harris offers no arguments relating to the district court's entry of summary judgment against her on her promotion and training and support claims. As a result, she is deemed to have abandoned all claims other than her Section 1981 compensation claim. See, e.g., Access Now, ___ F.3d at ____, 2004 WL 2113022, at *6; Jernigan, 341 F.3d at 1283 n.8.

salary at an artificially low level as compared with salaries of white colleagues performing similar work.[28]

When P. Harris interviewed for the Analyst position at SCS, she met with an interview committee and also had an individual meeting with the Marketing Research Department's manager, Charles Plunkett. Because P. Harris lacked education or experience in marketing, the interview committee recommended against hiring her; Plunkett, however, overrode the committee's recommendation and chose to offer P. Harris the Analyst position. Plunkett testified that, owing to P Harris's lack of experience and marketing education, he would ordinarily have offered her an entry level position as a Market Research and Support Analyst II. However, based on P. Harris' salary grade at GPC, hiring her as an Analyst II would have precluded giving her a raise, presumably one reason she had desired to transfer to SCS. As a result, Plunkett chose to select P. Harris as an Analyst I, placing her in a higher salary grade than her position at GPC. In doing so, Plunkett awarded P. Harris an 8% raise in this new position, which was his understanding of the maximum pay increase that an employee transferring from

---

[28]Because P. Harris was never an employee of TSC or SCES, and was no longer an employee of GPC during the timeframe relevant to this appeal, we affirm the district court's grant of summary judgment in favor of these defendants. See Llampallas, 163 F.3d at 1242; supra note 18. The remainder of our analysis evaluates whether summary judgment was properly granted with respect to defendant SCS.

GPC could receive.[29]  P. Harris continued to receive substantial salary raises during her tenure at SCS.[30]

In spite of the raises she received, P. Harris maintains that she suffered discrimination in compensation in that her salary still was lower than those paid to white co-workers performing the same tasks.  The district court concluded that three white employees were valid comparators: John Page, Darin Klein, and Rebekah Golden.  All three employees were paid higher salaries than P. Harris, and we agree with the district court that P. Harris successfully established a prima facie case of compensation discrimination.  However, SCS offered legitimate, non-discriminatory explanations for the pay disparities -- that P. Harris did not have either the professional experience or formal education of Page, Klein, and Golden, could not therefore perform her job as efficiently or independently, and was thus less valuable to the department.  The district court concluded that P. Harris had failed to rebut these reasons and had not established that the proffered reasons were pretext.

---

[29]The 8% raise P. Harris received brought her salary from $39,432 annually to $42,587 annually.  Notably, P. Harris never questioned this figure, asked for a higher salary, or gave Plunkett any reasons why her compensation should be more favorable.

[30]For example, less than a year after her promotion to the Analyst I position at SCS, P. Harris received a 4.2% merit raise. A year later, in March 1999, she received a 4.9% raise.  In addition, P. Harris received the highest percentage incentive bonus in her department, 15%.

On appeal, P. Harris contends that the district court erred because she had, in fact, established pretext as to Page and Golden.[31]  However, on this record we cannot find "such weaknesses, implausibilies, inconsistencies, incoherencies, or contradictions in [SCS's] proferred legitimate reasons . . . that a reasonable factfinder could find them unworthy of credence."  Combs, 106 F.3d at 1538 (citation and internal quotation marks omitted).  P. Harris's own contention that she was equally qualified and experienced does not create an issue of fact.

P. Harris holds a master of business administration degree from the DeVry Institute and had worked for GPC for six years prior to taking the Analyst I position at SCS; she maintains that she gained relevant marketing experience at GPC.  Golden possessed a bachelor's degree and had six years of market research experience before joining SCS, in which she held marketing positions including Project Director of Marketing, Supervisor of Marketing Research, and Marketing Research Coordinator for Cox Communications.  Page had limited work experience, having worked as a Market Research Management intern with BellSouth Communications for six months, but held a bachelor's degree in

---

[31]Apparently conceding that the superior qualifications of Klein provided a legitimate, non-discriminatory reason for Klein's higher salary, P. Harris offers no argument on appeal using Klein as a comparator.  Indeed, Klein possesses master's and doctorate degrees from the University of Pennsylvania, specializes in communications and research, and had professional experience in market research.

86

business and marketing as well as a master's degree in marketing research from the University of Georgia, one of only a few universities to offer an advanced degree in market research.

Both Golden and Page were external hires, unlike P. Harris, who was an internal transfer from GPC. Plunkett testified that he considered different criteria in hiring Golden and Page, who were hired in tight labor markets in which new employees could command more competitive compensation packages. According to Plunkett, when Golden was hired, her extensive marketing experience allowed her to perform more efficiently than P. Harris; Golden was able to work with minimal supervision and was given more responsibility than P. Harris.

Similarly, while Page lacked Golden's extensive experience, Plunkett testified that Page's training at the University of Georgia made him well-prepared to take on extensive market research tasks. Plunkett also stated that he believed a candidate with Page's education could develop more rapidly than an employee like P. Harris, who lacked the training, and could also help SCS attract additional graduates from the University of Georgia's graduate program in Market Research. According to Plunkett, Page's valuable educational experience allowed him to work independently and take on significant responsibilities.

The plaintiff contends that her master's degree from the DeVry Institute and six years of marketing experience at SCS, much of which was spent effectively in on-the-job training, were equivalent to the qualifications of Page and Golden. However, Plunkett offered legitimate explanations for why the educational and work experiences of Page and Golden were more valuable to him as their manager.

P. Harris's assertion that she deserved to earn the same salary as these employees does not render Plunkett's stated explanations unworthy of credence or otherwise raise any genuine issue of fact. As we have observed, we do not "sit as a super-personnel department that reexamines an entity's business decisions." Elrod, 939 F.2d at 1470 (citation and internal quotation marks omitted). In the absence of any other evidence that Plunkett's compensation decisions were motivated by race, we conclude that the district court did not err in granting summary judgment in favor of SCS.

### G. Sarah Jean Harris

S.J. Harris also claims that the district court erred by granting summary judgment for the defendants on her claims of discrimination in compensation and unlawful retaliation.[32] The district court concluded that because of S.J. Harris's

---

[32]S.J. Harris offers no argument on appeal relating to her promotion discrimination claim, and is therefore deemed to have abandoned any promotion claims. See, e.g., Access Now, ___ F.3d at ____, 2004 WL 2113022, at *6; Jernigan, 341 F.3d at 1283 n.8.

unique disciplinary history, the comparators she used to establish a prima facie case of compensation discrimination were not similarly situated, and that even if S.J. Harris had been able to establish a prima facie case, she failed to show that the proffered legitimate reasons for her compensation were pretextual. The district court also determined that S.J. Harris failed to show pretext as to the legitimate reason offered to explain her termination: that she was fired because, while on disciplinary probation, her job performance deteriorated and she falsified a company document. But Harris contends that a material issue of fact still remains as to whether the proffered reasons were a pretext for racial discrimination.

GPC hired S.J. Harris as a General Clerk in 1979, and her employment was terminated on August 24, 2000, approximately a month after this case was filed.[33] From 1997 until her firing, S.J. Harris worked in Duluth, Georgia as a Region Support Representative, a customer service position in GPC's Gwinnett Region. It is undisputed that, while she held this position, S.J. Harris received poor performance evaluations and was eventually subjected to formal discipline. In evaluating S.J. Harris's job performance in 1997, her supervisor, Hugh Walters

---

[33]S.J. Harris was never employed by, nor did she ever apply for a position with defendants TSC, SCES, or SCS. Accordingly, we affirm the district court's grant of summary judgment in favor of these defendants. See Llampallas, 163 F.3d at 1242; supra note 18. The remainder of our analysis is directed to whether summary judgment was properly granted to defendant GPC.

("Walters"), noted concerns relating to S.J. Harris's personal use of the telephone, as well as her punctuality, cooperation, teamwork, and communications with co-workers. Similar concerns were also expressed in S.J. Harris's evaluation for 1998, and S.J. Harris received ratings of "Unsatisfactory" or "Needs Improvement" in all categories on her mid-year 1999 evaluation.

Because of concerns about her job performance, S.J. Harris was placed in GPC's Positive Discipline program in mid-1999. GPC's disciplinary program prescribed formal processes designed to improve employee performance: at level one, S.J. Harris received the "Oral Reminder" about her work goals, and at level two she received the "Written Reminder" laying out the improvements she needed to make. When her job performance did not show sufficient improvement, S.J. Harris was placed in the final level of discipline, the "Decision-Making Leave" ("DML"). S.J. Harris's placement on DML occurred on October 7, 1999, at which time she was given a day off to decide whether she wished to leave GPC, or to return and redouble her efforts to improve her job performance. GPC employees placed on DML status are informed that if any disciplinary action occurs within 18 months after placement on DML, then the employee will likely be fired.

After returning to work, S.J. Harris showed some improvement in her performance during the later part of 1999 and the first months of 2000. However,

90

GPC has offered uncontroverted evidence that in July and August 2000, Walters received complaints about S.J. Harris both from customers and co-workers, including complaints that her personal telephone usage had again increased, and that she was not completing assignments in a timely fashion. In addition, Walters received several complaints about delays for service orders that S.J. Harris oversaw. The plaintiff has not offered any evidence challenging GPC's assertion that much of her work in this time period suffered from various errors.

S.J. Harris argues, however, that this evidence must be pretextual, because an evaluation she received just before her termination in August 2000 failed to refer to these performance issues. Indeed, GPC acknowledges that S.J. Harris's performance improved somewhat in late 1999 and during the first part of 2000. But the problems that GPC maintains led to Harris's firing occurred in July and August 2000, while the performance evaluation covered only the period from January to June 2000, thus explaining why the disciplinary issues of July and August were absent from the evaluation.

According to GPC, the event that actually precipitated the firing occured in late August 2000. On August 22, 2000, Walters learned that an engineer, Keith Thomas ("Thomas"), received a work order from S.J. Harris that day, which Thomas believed had originally been filed with S.J. Harris on August 16, 2000.

91

After speaking with Thomas and his supervisor, Walters concluded that S.J. Harris had falsified a computer entry to make it appear as if she had given Thomas a work order on August 16th, when in fact she had failed to do so until August 22nd. Walters conferred with other administrators and concluded that because of S.J. Harris's DML status, the decline in her performance in the summer of 2000, and her falsification of the computer entry, her employment should be terminated. S.J. Harris was fired on August 24, 2000.

We turn, first, to S.J. Harris's argument that the district court erred by entering summary judgment for GPC on her retaliation claim. To establish a prima facie showing of retaliation under Title VII, "the plaintiff must show (1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relation between the two events." Meeks v. Computer Assocs. Int'l, 15 F.3d 1013, 1021 (11th Cir. 1994).

Here, the first two elements are not in dispute, and S.J. Harris established a prima facie case of retaliation because the delay between the filing of the lawsuit and her firing was so brief. See Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 590 (11th Cir. 2000) (explaining that "close temporal proximity" may be sufficient to establish causal relation in retaliation cases). However, GPC may rebut the prima facie case by offering a legitimate, non-discriminatory reason for S.J. Harris's

termination. GPC has done so by maintaining that S.J. Harris was fired because of the speedy and substantial decline in her job performance during the late summer of 2000, and because of her manager's good-faith belief that she had falsified a computer entry.

After review of the record, we are satisfied that the district court properly concluded that Walters honestly believed Harris had falsified the record. The relevant issue here is not whether Harris actually falsified the entry, but rather whether Walters honestly believed Harris falsified the entry. See Elrod, 939 F.2d at 1470; E.E.O.C. v. Total Sys. Servs., Inc., 221 F.3d 1171, 1176 (11th Cir. 2000). The record reflects that on August 22, 2000, S.J. Harris printed a service order and provided it to Thomas. On the same day, she made a computer entry stating that she had given the order to Thomas on August 16, 2000. GPC introduced evidence that Walters conferred with Thomas and his supervisor about the incident, examined the document in question, and honestly believed S.J. Harris had falsified the document. Because she was in the final stage of disciplinary probation and had been the subject of numerous complaints, S.J. Harris was terminated for this incident. She has introduced nothing to rebut this evidence, and therefore, she has not raised a genuine issue as to pretext. Accordingly, we discern no error in the district court's grant of summary judgment on the retaliation claim.

Next, S.J. Harris claims that she was discriminated against in compensation in that she was paid less than white employees in similar positions. Notably, S.J. Harris does not dispute that her disciplinary record was distinguishable from those of the alleged comparators she identifies. Indeed, from 1997 to 1999, and again in July and August 2000, S.J. Harris had a demonstrably poor job performance. S.J. Harris does not dispute that her performance evaluations were negative, or that she was disciplined in 1997 and 1998 for making excessive personal phone calls and habitual tardiness. Moreover, in 1998, two of S.J. Harris's job responsibilities were withdrawn because of performance issues, and in her 1999 evaluation, S.J. Harris's supervisor noted that she remained unable to return from lunch on time and continued making too many personal calls.

In spite of her disciplinary history, S.J. Harris alleges discrimination in that she was paid less than co-workers Barron and Collett. But these comparators had no record of disciplinary problems. Neither was placed in GPC's Positive Discipline program, let alone on DML status. In fact, S.J. Harris was the only Customer Service employee in the Gwinnett Region to be placed on DML status. GPC's annual merit pay increases and bonuses are related to performance, and the difference in performance evaluations between Harris and Barron and Collett renders the latter two inappropriate comparators. See MacPherson, 922 F.2d at

94

774 n.16. Finally, Collett worked as an Operating Assistant, a job one level higher than S.J. Harris's, further diminishing her value as a comparator. Again, the district court did not err in entering summary judgment against S.J. Harris on her compensation claim. See Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1313 (individuals lacking disciplinary and performance issues of plaintiff were inappropriate comparators), superseded in other part by 151 F.3d 1321 (11th Cir. 1998).

## H. Irene McCullers

McCullers contends on appeal that the entry of summary judgment in favor of the defendants on her promotion and compensation claims was error. McCullers maintains that she established a prima facie case of discrimination in promotions and compensation and raised a genuine issue of material fact as to whether the defendants' stated justifications were pretextual. Specifically, McCullers claims that she was discriminated against by being denied a progressive promotion from Processing Operator I to Processing Operator Senior, and that she was paid less than similarly situated white co-workers.

McCullers began working as a file clerk for GPC in 1978, and transferred to SCS in January 1997.[34] When McCullers first transferred to SCS, she received the job title of Computer Operator I. At SCS, McCullers worked with, among others, three white colleagues, Mildred Brune ("Brune"), Shirley Keen ("Keen"), and Faye Starbird ("Starbird"). Brune, Keen and Starbird all had at least six more years of experience inside the defendant companies than did McCullers.

When the department in which McCullers and her white colleagues worked was reorganized in 1999, McCullers's job title was changed to Processing Operator I. Brune and Keen were also reclassified as Processing Operators I, while Starbird's job title was changed to Processing Operator II. In May 1999, Starbird was promoted to Processing Operator I, and in March 2000, Brune was

---

[34]McCullers was never employed by, nor did she ever apply for a position with defendants TSC or SCES. Accordingly, we affirm the district court's grant of summary judgment in favor of these defendants. See Llampallas, 163 F.3d at 1242; supra note 18.

In addition, while McCullers did work for GPC between 1978 and January 1997, her employment at GPC occurred more than two years prior to the filing of this lawsuit. As we have explained, see supra note 19, the district court applied a two-year statute of limitations to the plaintiffs' claims, and because McCullers did not raise any objection to the two-year limitations period applied by the district court below or in her initial briefs, she is deemed to have waived any argument that a longer limitations period applies. See Padilla-Reyes, 247 F.3d at 1164 ("Because this issue is raised for the first time in supplemental briefing, we deem it waived."). Accordingly, we affirm the district court's grant of summary judgment in favor of defendant GPC. The remainder of our analysis relating to McCullers's claims, therefore, is devoted to the final summary judgment entered in favor of defendant SCS.

promoted to Processing Operator Senior. McCullers was never promoted from Processing Operator I to Processing Operator Senior.

McCullers alleges that she was discriminated against in promotions when SCS refused to promote her to Processing Operator Senior, as it did with Brune. SCS responds that McCullers was less qualified for the promotion than was Brune. SCS maintains that Brune's work performance consistently exceeded expectations, while McCullers's did not, in large part because of problems with work attendance and tardiness. McCullers also contends that she was discriminated against in compensation in that she was paid less than Brune, Keen, and Starbird. SCS argues, in turn, that McCullers was paid less than these co-workers because McCullers lacked the seniority of her colleagues.

We turn first to McCullers's claim of promotion discrimination. The district court concluded that McCullers had failed to establish a prima facie case of promotion discrimination because she had not established elements two or four of the appropriate test, which required McCullers to prove that (1) she was a member of a protected class; (2) she applied for and was qualified for a promotion; (3) she was denied the promotion; and (4) a similarly situated white employee instead received the promotion. See, e.g., Denney, 247 F.3d at 1183; Lee, 226 F.3d at 1253; Taylor v. Runyon, 175 F.3d 861, 866 (11th Cir. 1999).

McCullers argues that the district court erred by misconstruing the fourth element of the Denney test for discrimination in promotion. McCullers contends that the district court erroneously required McCullers to show that a similarly situated white employee was promoted over McCullers specifically, and that this ruling was wrong "because no 'promotion over the plaintiff' requirement exists" under Denney. Appellants' Brief at 51. First, Denney did not involve a non-competitive (progressive) promotion like the one that McCullers was denied, and the district court also cited Harris v. Secretary, U.S. Department of the Army, 119 F.3d 1313, 1321 (8th Cir. 1997), a case that did involve a progressive promotion like the one at issue for McCullers. But we need not determine whether the district court's gloss on the fourth element under Denney was inaccurate, since we agree with the district court that McCullers failed to establish the second element -- that she was qualified for the promotion in question.

The record demonstrates that promotion from Processing Operator I to Processing Operator Senior required an employee's performance to consistently meet and exceed expectations. McCullers contends that during the relevant period, SCS consistently ranked her job performance as a four, on a five-point scale, and that this ranking indicates that she met and exceeded expectations. However, McCullers's personal opinion that being ranked as a four meant she

exceeded expectations is insufficient to establish her qualification. See Holifield, 115 F.3d at 1564 (explaining that a plaintiff's "opinion, without more, is not enough to establish a prima facie case").[35]

Indeed, in contrast to McCullers's own self-assessment, her managers have maintained that her performance "was viewed as average -- she was not a consistently strong performer -- she did not consistently perform at a level that met and exceeded the expectations of her job." R200 at 11; see also id. at 21.[36] The only evidence McCullers has proffered to support her qualification is her own opinion, while all the other record evidence supports SCS's position that McCullers was not qualified for the promotion to Processing Operator Senior. The district court did not err in concluding that McCullers had failed to establish a prima facie case of promotion discrimination.

---

[35]Moreover, even the document that McCullers relies on to establish that a four ranking demonstrates her qualification undercuts her case: this document states that employees in the fourth category "consistently meet and frequently exceed[] . . . expectations," while it is only employees in the fifth category who "consistently exceed[] performance objectives." R262-18. As the district court observed, McCullers "has never met Defendants' job assessment criterion of 'meets and exceeds expectations' although she has always been found to 'meet expectations.' Under Defendant's policy, this is not enough for a progressive promotion." R300 at 14.

[36]Indeed, the defendants have submitted multiple exhibits -- including performance assessments, employee development materials, and skills assessments -- which identify various areas in which McCullers's managers felt she needed improvement. Her managers expressed concerns regarding McCullers's work habits, including long lunches, arriving to work late, and taking excessive sick time, and generally rated her skills in the middle, rather than the upper, range of the assessment scale. See, e.g., R137-96; R137-100; R137-105; R137-112; R137-118.

As for McCullers's compensation claim, the district court determined that McCullers failed to establish a prima facie case of discrimination because she did not identify a proper comparator.  The three employees McCullers argues are valid comparators -- Starbird, Brune and Keen -- all had more than six years of seniority over McCullers. Seniority may constitute a legitimate, non-discriminatory justification for differences in compensation.  See, e.g., Irby v. Bittick, 44 F.3d 949, 956 & n.10 (11th Cir. 1995); Mulhall v. Advance Sec., Inc., 19 F.3d 586, 599 (11th Cir. 1994).  Because McCullers failed to identify any comparators with similar levels of seniority, she has failed to establish a prima facie case of discrimination in compensation.  The district court did not err in entering summary judgment against McCullers.

## I.  Carolyn Wilson

Finally, the plaintiff Wilson argues that the district court erred in granting summary judgment for the defendants on her promotion and discrimination claims. Wilson maintains that the court erred by determining that she had failed to show that the proffered legitimate, non-discriminatory reasons for denying Wilson a promotion  were pretextual.  Wilson also finds error in the district court's conclusion that she failed to make a prima facie case of compensation discrimination because she did not identify any proper comparators.

100

Wilson began working for GPC in 1985, but in late 1997, she applied for

and received a position within the Finance Center of SCES in Atlanta.[37] Wilson

began working in this position in February 1998. The hiring manager for the

opening at SCES, Karla Fuller ("Fuller"), listed a descriptive job title of the

position as "Finance Center Supervisor," although the offer letter Wilson received

referred to the job as "Project Analyst Senior," an exempt level two position.

Wilson's job performance in the Finance Center Supervisor merited several raises:

she received percentage increases in salary in November 1998, March 1999, and

March 2000, and also repeatedly received incentive awards and bonuses of as

much as 20% of her salary.

In November 1999, Wilson applied for a position as Business Analyst II

with SCES. Fuller was the hiring manager for this position, too, and the

successful candidate would be supervised by Fuller as well. The preferred

qualifications for the Business Analyst II position included the ability to start the

job with minimal training and supervision; a bachelor's degree in finance,

---

[37]Wilson was never employed by, nor did she ever apply for a position with defendants TSC or SCS. Accordingly, we affirm the district court's grant of summary judgment in favor of these defendants. See Llampallas, 163 F.3d at 1242; supra note 18. Moreover, while Wilson did work for GPC for a dozen years, her employment at GPC ended before the statutory period relevant to this lawsuit. Accordingly, we affirm the district court's grant of summary judgment in favor of defendant GPC. The remainder of our analysis is devoted to the summary judgment entered in favor of defendant SCES.

management, or accounting; experience in the construction industry; good oral and written communications ability; and familiarity with the Excel software program. Although Wilson did not have experience in construction or the preferred type of bachelor's degree, Fuller nevertheless selected Wilson for an interview.

Although Fuller interviewed Wilson for the Business Analyst II position, the job was ultimately offered to a white woman, Sarah McFall. Fuller suggested that both Wilson and McFall were qualified for the Business Analyst II job, but McFall had a bachelor's degree in accounting, unlike Wilson, and had limited work experience in the construction industry, again unlike Wilson. SCES maintains that Fuller -- as the hiring manager and supervisor for the position -- honestly believed that McFall was better qualified for the job than Wilson and would be able to perform with little training or supervision.

As the district court concluded, Wilson successfully established a prima facie case of promotion discrimination by proving that she was qualified for the promotion and that the position was offered to McFall, a white woman. See, e.g., Denney, 247 F.3d at 1183; Lee, 226 F.3d at 1253. However, the district court also concluded that Wilson had not established pretext as to the legitimate reason proffered to explain denying Wilson the promotion -- that Fuller, the hiring manager, sincerely believed that McFall was better qualified.

Wilson's essential argument as to Fuller's conclusion that McFall had superior qualifications is that the asserted belief must be pretextual, because Wilson herself believes she was better qualified. But whether we could conclude Wilson was better qualified than McFall is not the issue here. See Elrod, 939 F.2d at 1470. As we have already explained, a plaintiff cannot establish pretext simply by showing that she is more qualified than the successful applicant. Rather, for Wilson to establish pretext, she would have to "adduce evidence that the disparity in qualifications is 'so apparent as virtually to jump off the page and slap you in the face.'" Cofield, 267 F.3d at 1268 (quoting Denney, 247 F.3d at 1187). It is undisputed that Wilson lacked the educational credentials that McFall possessed, and that, unlike Wilson, McFall had at least minimal construction industry experience.

As the supervisor and hiring manager for the vacant Business Analyst II position, Karla Fuller was in a unique position to determine that McFall was better qualified, since Fuller knew the specific job requirements of the position, had supervised Wilson, and was intimately familiar with Wilson's skills and qualifications. On this record, we cannot say that any disparity in qualifications rises to the necessary level of obviousness.

As for Wilson's compensation claim, the district court concluded that summary judgment was appropriate because Wilson failed to establish a prima facie case. Specifically, Wilson failed to identify a similarly situated comparator. On appeal, Wilson asserts not only that she was paid less than similarly situated white employees, but also that white employees occupying "lower" positions were paid more generously. However, Wilson has not established that the proposed comparators had similar levels of experience or education, nor has she established the comparators' job responsiblities with any particularity. Wilson's assertion that these individuals were "lower" employees is offered in a wholly conclusory manner, based on her own subjective belief. As a result, Wilson's argument fails. See Carter v. City of Miami, 870 F.2d 578, 585 (11th Cir. 1989); see also Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir.1990) (collecting cases). The district court's entry of summary judgment was appropriate here, too.

IV.

In sum, we are persuaded that the district court did not err in any of its determinations, and, accordingly, affirm its judgments in all respects.

**AFFIRMED**.